EMPIRE STATE TRUST COMPANY

*v.*

WILLIAM F. FISHER COMPANY et al.

[Submitted December 2d, 1903.   Decided February 20th, 1904.
Filed July 9th, 1904.]

1. A company was indebted in the sum of $81,200. It owned a brick-producing plant appraised at $100,000, and was capable of earning on the amount at which it was capitalized ($185,000) a fair profit. The plant had cost over $200,000, and could not be replaced for $250,000. The company had on hand a quantity of unburned bricks, later sold for $15,000. It also owned village lots worth $25,000. On its failure to pay a creditor it executed a mortgage to secure him. This creditor, before becoming such, investigated the affairs of the company and believed that the company was solvent. About a month after the execution of the mortgage the company was adjudged a bankrupt, and the trustees could secure only $75,000 for the property.—*Held*, that the company, at the time of executing the mortgage, was not insolvent, within Bankrupt act of July 1st, 1898, chapter 541, section 1, paragraph 15 (*U. S. Comp. Stat. 1901 p. 3419*), providing that a person shall be deemed insolvent when the aggregate of his property shall not, at a fair valuation, be sufficient to pay his debts.

. 2. A solvent debtor giving a mortgage to secure a creditor does not give a preference, within Bankrupt act of July 1st, 1898, chapter 541, section 60 (*30 Stat. p. 562; U. S. Comp. Stat. 1901 p. 3445*), specifying when a person, "on being insolvent," shall be deemed to give a preference.

3. The taking of security by a creditor for money presently or previously loaned is not evidence that the creditor believes that the debtor is insolvent.

4. The words "for. a present consideration," in Bankrupt act of July 1st, 1898, chapter 541, section 67 (*30 Stat. p. 564; U. S. Comp. Stat. 1901 p. 3449*), providing that liens given or accepted in good faith, and not in contemplation of or in fraud on the act, "and for a present consideration," shall not be affected by the act, do not render invalid a mortgage to secure a pre-existing debt.

On final hearing on bill, answer and proofs.

The complainant filed a bill to foreclose a mortgage given to it by the William F. Fisher Company, a corporation, upon property in Middlesex county. It made several holders of subsequent encumbrances parties thereto. Among them, and next in order of priority, was the Broadway Trust Company, which held, and holds, a mortgage for $15,000. Next below that mortgage are two to William F. Fisher and one to Frieda Hart.

Subsequently to the giving of these mortgages the Fisher company was thrown into involuntary bankruptcy, and Messrs. Samuel F. Wylie and Frederick Weigel were appointed trustees.

The Broadway Trust Company filed no answer at first, but gave notice under the rule that it desired to have its mortgage reported upon. Subsequent to this Wylie and Weigel, the trustees, applied for and obtained leave to appear as parties defendant and to answer.

By their answer they attacked the validity of all the mortgages above mentioned, on the ground that they were given under circumstances which rendered them voidable at the instance of the trustees.

The issue between the trustees and the complainant as to its mortgage was brought to a hearing and determined in favor of complainant shortly before June 18th, 1903, and decree made for foreclosure and sale.

The execution on that decree was stayed by order of the federal court. In the meantime the Broadway Trust Company filed its answer to the bill of complaint, which answer included an answer to so much of the answer of the trustees as attacked its mortgage.

An issue in this irregular manner was made up between the Broadway Trust Company and the trustees in bankruptcy and brought to a hearing November 17th and December 2d, 1903.

*Mr. Sherrerd Depue* and *Mr. Ira Leo Bamberger* (of New York), for the Broadway Trust Company.

*Mr. Robert Adrain,* for the trustees.

PITNEY, V. C.

The mortgage of the Broadway Trust Company was made and executed September 10th, 1902, and recorded September 13th, of that year, to secure the sum of $15,000, with interest, in three months from that date.

Three days later the Fisher company executed three other mortgages: one to Fisher, its president, to secure an amount not exceeding $10,000; another to Frieda Hart, to secure an amount not exceeding $10,000; and a third to Fisher, to secure an amount not exceeding $20,000.

On October 4th, 1902, two small judgments were docketed against the Fisher company in the Middlesex common pleas.

Shortly after that a creditor took proceedings in bankruptcy against the said company in the federal court with the result that on October 27th, 1902, it was duly adjuged a bankrupt.

I shall first state the facts as I find them bearing on the question of the validity of the mortgage here in question.

The William F. Fisher Company was the owner of a valuable tract of clay land, of which two hundred and fifty acres were practically available for making brick, situate at and near the village of Sayreville, on the south side of the Raritan river, between New Brunswick and South Amboy. It also owned a proper proportion of sand-bank land, producing sand fit for use in moulding bricks. It also owned a large and complete brick

manufacturing plant, furnished with the best modern machinery, located on the banks of the river, with wharfing which enabled it to float its bricks to all the water-front towns and cities in the neighborhood.

Its plant was capable of producing over thirty million bricks a year. Besides, it had the reputation of making a superior article of common building brick, known as "Adamantine Brick," which enabled it to find a ready market.

This plant had cost over $200,000 and could not be replaced for $250,000. The average profit on the bricks manufactured and sold was $1 per thousand, and it had been manufacturing and selling from twenty million to thirty million a year. It was capitalized at $185,000, of which $156,000 were owned by William F. Fisher and the balance by friends and relatives of his; and of that balance he controlled a considerable portion by having advanced money upon it.

The only encumbrance upon this property was a mortgage for $24,000 to one of the New Brunswick banks.

The president of the company, Mr. William F. Fisher, was himself the owner of considerable real estate in New Brunswick and elsewhere in Middlesex and Monmouth counties, most of it unincumbered, and he was reputed to be a man of wealth.

Some time previous to May, 1902, he had been drawn into some outside speculative operations, apparently through the influence of one Max Hart, and although he was receiving, and was credited on the books of the company, with a large salary—for the last year or two, $10,000—he had, at the date of the mortgage here in question, overdrawn his account to the extent of about $60,000. There was also a debit account on the books of the company against Max Hart to the extent of $25,000.

All the foregoing appears by the evidence of Mr. Wylie, one of the trustees, who had been for years a trusted and trustworthy employe of the company and thoroughly familiar with its affairs.

In May, 1902, Mr. Fisher and Mr. Hart being, as I have said, engaged heavily in transactions outside the brick business, applied to Mr. Morris May, president of the Broadway Trust Company, for a loan. Mr. Hart had been introduced some two or

three years previously to Mr. May by a responsible business ac-quaintance of Mr. May as a wealthy and entirely reliable con-tractor in New York City, and Mr. May knew nothing to the contrary of the truth of his friend's statement at the time Mr. Hart called with and introduced Mr. Fisher in May, 1902.

Before making any loan, Mr. May made the usual inquiries as to the standing of Mr. Fisher and the Fisher company, for which the loan was asked. He inquired of their standing of the mercantile agencies and found them rated very high. He also required the usual statements of the financial standing of both the company and its president, and they were furnished.

In the statement of the company its real estate was estimated at $150,000; the plant and movables at $55,000; the outstand-ing accounts at $12,000, making $217,000.

The liabilities were stated as a mortgage, held by the New Brunswick bank, $24,000; notes, $7,000, and open accounts, $3,000, making a total indebtedness of $34,000, and leaving a net value of over $180,000. A certificate was also given that the company had no other debts or liabilities of any kind.

Mr. Fisher's personal statement gave a list of his real estate and stock in the Fisher company, &c., and states himself to be worth $250,000.

Fisher and Hart, at the same time, also presented to Mr. May a letter, purporting to be written by Mr. Parker, cashier of the New Brunswick bank, addressed to Mr. May, as follows:

"NATIONAL BANK OF NEW JERSEY.
"NEW BRUNSWICK, N. J., May 20, 1902.

"V. M. W. Suydam, President.          H. G. Parker, Cashier.

"*Morris May, Esq., President Broadway Trust Company, New York City:*

"DEAR SIR—W. F. Fisher & Company have carried their banking ac-count at this institution for some twenty years and conducted the same in a manner entirely satisfactory to the bank. From time to time they have borrowed large sums of money from us, and at the present we have a loan with them, but cannot increase it if we would, because of the limitation put upon us by the National Bank act.

"Mr. Fisher advises me that he expects to open an account at your Trust Company. You may rest assured that any statement that he may make to you is correct, and you can rely upon the same.

"W. F. Fisher & Company plant is a very valuable one, worth over $100,000.

"Mr. Fisher individually owns considerable property, which he can explain to you more fully than I.

"Wishing that you and Mr. Fisher may come to some arrangement mutually satisfactory, I am,

"Very truly yours,

"H. G. PARKER, *Cashier.*

"Ex A B D, Nov. 3/03."

No direct or positive proof of the genuineness of that letter was introduced, but I have no doubt that it was a genuine letter. It certainly had every appearance of being genuine, and Mr. May had every reason to believe, and did, in fact, believe it was genuine.

On the strength of those representations Mr. May discounted for the Fisher company two notes of $7,500 each, dated May 20th, 1902, one at three months and the other at four months.

The first note being unpaid at maturity, August 20th, 1902, action was immediately commenced thereon by the Broadway Trust Company against the Fisher company.

Immediately after the service of process negotiations for a settlement were entered into, excuse was made for the non-payment, on the ground of Mr. Fisher's personal illness, and on September 12th the mortgage here in question was given to secure as well the $7,500 which was past due as the $7,500 note, which would come due September 20th.

Mr. May and the officers of the Broadway Trust Company had no notice or information as to the financial condition of the Fisher company besides what has already been stated, except that its counsel learned that another mortgage, one to the Empire Trust Company, had been put on the property.

Let us see what was the exact financial condition of the company as disclosed by a careful examination of its affairs made by Mr. Wylie.

It was indebted to the New Brunswick bank $24,000; to the Empire Trust Company $15,000; and to the Broadway Trust Company $15,000, making $54,000. It was indebted to the laborers, who are preferred by our laws, in the sum of about $7,000. Besides that it was indebted to divers other indi-

viduals about $20,000, most of which represented the ordinary indebtedness of a going concern, in all $81,200.

These last figures were ascertained by me at the hearing, and their substantial accuracy was admitted by Mr. Wylie and the counsel of the trustees. They do not disclose any indebtedness to Mr. Fisher, and it is proper to say that since the hearing the contest between the trustees and Mr. Fisher as to the validity of his two mortgages, or either of them, has been judicially heard and determined against Mr. Fisher, not only on the ground that the mortgages were valueless under the sixty-fourth section of our Corporation act, but also on the ground that nothing was due him.

Now with regard to what might be called the available or quick assets of the company.

It had on hand about ten million moulded but unburned bricks, which were afterwards burned and marketed by Mr. Wylie under disadvantageous circumstances and produced $15,000, net; thereby discharging the laborers' preferred claims and leaving a balance in the hands of the trustees.

It is proper for me to say that the evidence satisfies me that if the moneys borrowed from the Empire Trust Company and from the Broadway Trust Company had not been diverted by the president to outside purposes and had been devoted, even partially, to the conduct of the regular business of the company under the supervision of Mr. Wylie, there would have been no interruption of the business of the company. I doubt if even the imposition of the mortgage to the Broadway Trust Company would have alarmed creditors and induced bankruptcy proceedings had it not been for the two mortgages to himself and the one to Frieda Hart, which Mr. Fisher was induced by the ill advice of New York counsel to put upon the premises.

But, besides the unburned brick just mentioned, Mr. Wylie swears that the company owned a large number of building lots facing on the main street of the village, much in demand and readily salable, and for which $25,000 could have been easily realized in a short time.

The sale of these lots would not have affected in the least the value of the property as a brick-producing plant.

Now as to the value of the property in the latter aspect.

It was appraised by the trustees, as stated by counsel, at over $100,000, and it was capable, with ordinarily good business management, of earning a fair dividend on the amount at which it was capitalized. The difficulty was that Mr. Fisher, the president and largest stockholder, had been, for a year or two, induced by bad business advice to neglect the business for which he was competent and go into outside speculation.

However, notwithstanding that the property was located in the midst of the brick-producing region of New Jersey, and had the very best natural advantages for being profitably worked, Mr. Wylie says that the best offer that the trustees had been able to secure for it was $75,000. But for the accumulation of interest on the indebtedness and the cost of the judicial administration, that sum would pay all the debts remaining, after applying thereto the proceeds of the burning and sale of the ten millions of bricks.

I have not dealt, in the above, with the mortgage from the company to Mrs. Hart. The question of indebtedness to her is under consideration and is strenuously denied by the trustees. I shall treat it, for present purposes, as representing no indebtedness.

But it must be borne in mind that this offer of $75,000 was made after the business of the company had come to a standstill, as it did immediately after the imposition of the mortgages to Mr. Fisher and Mrs. Hart, and the company was in the hands of the bankrupt court. It is common knowledge that such a condition has at once a depressing effect upon the market value of such a property.

Now, on these facts, the question is whether the mortgage here in question is a valid lien against the trustees in bankruptcy. That depends upon the construction of a few sections in the federal Bankrupt act.

The first to which I refer is paragraph 15, chapter 1, section 1, of "Definitions:"

"(15) A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property

which he may have conveyed, transferred, concealed or removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not, *at a fair valuation,* be sufficient in amount to pay his debts."

I come to the conclusion, on the facts, that at the time this mortgage was given the Fisher company was not insolvent, within that definition. I think that *"at a fair valuation"* the aggregate of its property was sufficient in amount to pay its debts.

The authorities seem to hold the reasonable rule that the assets of the debtor must, for the purposes of this section, be valued as those of a going concern, if that be the actual condition, and that subsequent actual insolvency is not the true and only test.

I also find as a fact that at that date the company had not conveyed, transferred, concealed or removed any of its property, with intent to defraud, hinder or delay its creditors, nor had it permitted any such action.

The next clause to which I refer is chapter 3, under the title "Bankrupts:"

"Acts of bankruptcy by a person shall consist of his having (1) conveyed, transferred, concealed or removed, or permitted to be concealed or removed, any part of his property with intent to hinder, delay or defraud his creditors, or any of them; or (2) transferred, while insolvent, any portion of his property to one or more of his creditors with intent to prefer such creditors over his other creditors."

Now, I do not find that the corporation, at the date of this mortgage, had committed any act of bankruptcy as therein stated, or as stated in any of the subsequent sections.

I think that the intention was to secure the Broadway Trust Company, but I am far from being satisfied that Mr. Fisher did not fully believe, when he executed the mortgage in question, that his property was amply sufficient to pay all his debts. I think he was ill advised, three days later, to execute the mortgages to himself.

But, it is argued by counsel for the Broadway Trust Company, admitting that the Fisher company did intend to prefer the

Broadway Trust Company, such intention on his part does not injure the security unless the Broadway Trust Company or its officers were aware that such was the intention of the Fisher company.

It must be observed here that the giving of the present mortgage was not a voluntary act on the part of the Fisher company, such as characterizes the giving of a security to a favored creditor. The parties were at arms' length. The trust company was suing for its debt and hastening judgment as rapidly as possible. It is to be presumed that its counsel knew that the judgment would be of little value, unless promptly paid, if the company were thrown into bankruptcy within four months after its recovery.

This indicates that they did not fear bankruptcy, but went about collecting their debt in the usual way.

Mr. Fisher, plainly, then yielded to pressure, and gave the mortgage as the best, and, under the circumstances, the only thing he could do, and the trust company accepted it in the ordinary way that any creditor would accept security for a debt.

I can see no difference in the giving of this mortgage and the giving of that to the Empire Trust Company, except that in one case the money was paid and advanced at the time of the giving of the mortgage, and in the other it had been advanced previously.

On this topic another section of the Bankrupt act is subsection *a,* of section 60, of chapter 6, in which the question of preferred creditors is treated:

"A person shall be deemed to have given a preference if, *being insolvent,* he has, within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

Now, it is to be observed that a necessary element in the preference there defined is that the debtor shall be insolvent.

As I have already determined that as a matter of fact there was no insolvency, as defined by the same act, at the date of the giving of this mortgage, there was therefore no preference under that section.

The next subsection states the effect of such preference:

"If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, *shall have had reasonable cause to believe* that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

I find that as a matter of fact, as already stated, the trust company had no reason to believe that it was being preferred by this mortgage. It was simply having its debt secured, not necessarily to secure the trust company against present insolvency, but naturally and properly and lawfully, under the Bankrupt act, to secure it against possible or probable future insolvency.

No doubt the officers of the trust company felt that the business methods of Mr. Fisher were not good, and that he was going behind, and that ordinary prudence required that they should have security.

. The taking of security by a money-lender for money loaned, either presently or previously, is not, I repeat, evidence that the lender believes that the borrower is insolvent.

We have two elements lacking, both of which are necessary in order to bring the present case within that section, viz., actual insolvency and belief in such insolvency by the creditor.

Another clause of the Bankrupt act which may be supposed to have some bearing upon the present case is subsection *c* of section 67, chapter 7, which is as follows:

"A lien created by or obtained in or pursuant to any suit or proceeding at law or in equity, including an attachment upon mesne process or a judgment by confession, which was begun against a person within four months before the filing of a petition in bankruptcy by or against such person, shall be dissolved by the adjudication of such person to be a bankrupt if (1) it appears that said lien was obtained and permitted while the defendant was insolvent and that its existence and enforcement will

work a preference, or (2) the party or parties to be benefited thereby had reasonable cause to believe the defendant was insolvent and in contemplation of bankruptcy, or (3) that such lien was sought and permitted in fraud of the provisions of this act."

I do not find the present case within either the letter or the equity of that subsection.

Then we have subsections *d* and *e* of that section:

· "Liens given or accepted in good faith and not in contemplation of or in fraud upon this act, and· *for a present consideration,* which have been recorded according to law, if record thereof was necessary in order to impart notice, shall not be affected by this act."

Subsection *e* deals with conveyances which are void at common law because made for the purpose of hindering, delaying or defrauding creditors.

As I have stated above, I find no such element in this case.

It will be observed that the language used in indicating the state of mind of the grantee or mortgagee whose security is declared voidable is that *he had reasonable cause to believe the defendant was insolvent and in contemplation* of bankruptcy; and, in another place, that *he had reasonable cause to believe* that the grantor or mortgagor intended to give a preference.

This language, *"had reasonable cause to believe,"* was dealt with by the supreme court of the United States, in *Grant* v. *Bank, 97 U. S. 80,* in an opinion by Mr. Justice Bradley. He there shows a clear distinction between *suspecting* the person to be insolvent and *believing* him to be insolvent. He uses this language: . *"Dicta* are not wanting which assume that it has the same meaning as if it had read 'having reasonable cause to suspect such a person is insolvent.' But the two phrases are distinct in meaning and effect. It is not enough that a creditor has some cause to suspect the insolvency of his debtor, but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case, would render the business transactions of the community altogether too insecure. It was never the intention

of the framers of the act to establish any such rule. A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it, and yet such belief as the act requires may be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances, is not prohibited by the law."

Further on he speaks of the policy of the law in this connection.

On this topic we have the headnote of the case of *Tiffany* v. *Lucas, 15 Wall. 410,* which, in the following language, indicates the scope of the opinion: "A sale by a person in fact insolvent, and made within six months of a bankruptcy subsequently decreed, is not necessarily and without regard to its character void, under the thirty-fifth section of the Bankrupt act.

"If it was made in good faith, for the honest purpose of discharging debt, and in the confident expectation that by so doing the person could continue his business, it will be upheld. On the contrary, if he made it to evade the provisions of the Bankrupt act, and to withdraw his property from its control, and the vendee either knew or had reasonable cause to believe that the vendor's intention was of this character, it will be avoided.

"Thus two things must concur to avoid the sale—the fraudulent design of the bankrupt and the knowledge of it on the part of the vendee, or reasonable cause to believe it existed."

Those cases dealt with the language and provisions in the old Bankrupt act similar to that of our present act.

Some of the provisions of the present act were brought under consideration by the supreme court of the United States in the case of *Pirie* v. *Chicago Title and Trust Co., 182 U. S. 438.*

There merchants, being quite conscious that they were insolvent, made a payment to a creditor on account of his debt within four months of their bankruptcy, which payment created a preference, to its extent, to those creditors. The latter had no reasonable cause to believe that their debtors were insolvent. It was held that the creditors were entitled to retain the pay-

ment so made, but were precluded from receiving a dividend on the balance of their claim.

The force and effect of subsection *d* of section 67 of the act above quoted must necessarily have been drawn into consideration by Vice-Chancellor Emery in *Congleton* v. *Schreihofer, 54 Atl. Rep. 144.*

There a conveyance was made by the bankrupt to his sister of land in payment of a long pre-existing debt and the conveyance was sustained, and it was distinctly held that the fact that it was given for a pre-existing debt was no reason why it should be declared void in favor of the creditors under the Bankrupt law. He also holds that such a conveyance could not be considered void because made for the purpose of hindering, delaying and defrauding his creditors generally.

No authority was cited to me for the position that the fact that the consideration for the mortgage here in question was money previously advanced, could have the effect of invalidating it. The words "for a present consideration," found in subsection *d* of section 67, would seem to include a past consideration existing at the present time, and the section would seem to be aimed at a mortgage or conveyance given to secure a consideration afterwards to be advanced.

From among the numerous other cases cited to me by counsel, I select the following as bearing upon the subject:

*Crawford* v. *Taylor, 6 Gill & J. 323; 26 Am. Dec. 579,* was, like the present, a suit by a trustee in insolvency (not bankruptcy) to set aside a transfer of property by the insolvent, and the points decided by the supreme court of Maryland are set forth in the headnote, thus:

"A voluntary assignment, or an assignment with an intent to give an undue preference to a creditor by a debtor in contemplation of bankruptcy, is void. An assignment is not *voluntary* when made under the urgent demands of the creditors.

"That the claim is not due for the security of which the assignment was made, does not vitiate it."

The insolvent laws of Maryland, like the bankrupt laws of the United States, provided that any deed of assignment, &c.,

to a creditor by any person with a view, or under an expectation, of being or becoming an insolvent debtor, and with an intent thereby to give an undue and improper preference to such creditor, is void. And it was admitted in the case that the property of the debtor, at the time he made the transfer above in question, was insufficient to pay his debts, but the court held that the assignment was not voluntary because it was produced by the urgent pressure of the creditors.

The case of *Chicago Title and Trust Company* v. *John A. Roebling's Sons' Co. et al., 107 Fed. Rep. 71,* deals with the question of what is a fair valuation of property under the section above cited.

That was an action by a trustee in bankruptcy to recover from the Roebling sons the amount which they had realized under a judgment and execution against a manufacturing company at Peoria, Illinois. The judgment was entered by confession in less than four months before the bankruptcy, and it was held that as at a fair valuation of the bankrupt's property at the time the judgment was entered the concern was not insolvent, the preference was not unlawful, because, under the proper construction of the Bankrupt act he was not insolvent at the time the judgment was entered.

*In re Eggert,* in the circuit court of appeals, the seventh circuit (1900), *102 Fed. Rep. 735; 43 C. C. A. 1,* the question of what was the state of mind of the creditor, who obtains security from an insolvent debtor, was discussed, and apparently all the cases up to that date were dealt with, and the head-note shows the conclusion as follows:

"In determining whether the taking of security by a creditor constitutes an illegal preference, under Bankrupt act of 1898, section 60b, the creditor is not to be charged with knowledge of his debtor's financial condition from mere non-payment of his debt, or from circumstances which give rise to mere suspicion in his mind of possible insolvency. On the other hand, it is not essential that the creditor should have actual knowledge of or belief in his debtor's insolvency, but it is sufficient if he has reasonable cause to believe him insolvent. If facts and circum-

stances with respect to the debtor's financial condition are brought home to him such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose."

In the same line is *In re Chappell, 113 Fed. Rep. 545,* the second headnote of which is as follows:

"A merchant, seven months before filing his petition in bankruptcy, sent a creditor a post-dated check and a note for the balance of his debt, and afterwards renewed the note, paying it a little less than four months before the petition was filed.— *Held,* that such acts, while showing that he was not in possession of ready money to meet this particular debt, were not evidence that he was insolvent, within the meaning of the Bankrupt act, section 1, subdivision 15, providing that a person shall be deemed insolvent whenever the aggregate of his property, exclusive of any which he may have fraudulently concealed or conveyed, shall not, at a fair valuation, be sufficient in amount to pay his debts."

My conclusion is that the Broadway Trust Company's mortgage is a valid lien on the premises.

I will advise a decree accordingly.