[L. A. No. 18769. In Bank. Dec. 22, 1943.]

CLYDE E. CATE, as Trustee, etc., Appellant, v. CERTAIN-TEED PRODUCTS CORPORATION (a Corporation), Respondent.

Henry O. Wackerbarth and Ralph Robinson for Appellant.

David E. Peckinpah and L. N. Barber for Respondent.

CARTER, J.—In this action by a trustee in bankruptcy to set aside certain transfers by the debtor which, it is alleged, accomplished voidable preferences, judgment was rendered for defendant creditor.

A petition was filed on June 24, 1939, by three creditors to have Central Valley Wholesale Lumber Company, referred to as the debtor, declared an involuntary bankrupt. The transfers alleged to have created the preferences were made to defendant, a creditor of the bankrupt, within four months prior thereto.

The debtor was engaged in the wholesale building material business at Fresno, and defendant in manufacturing and selling such materials at Richmond, California. Defendant sold

materials to the debtor from June to November, 1938, on open account with thirty to sixty days' credit. On March 1, 1939, the debtor was in default on the account in the sum of $1,956.36. The first alleged preference occurred when defendant's agent went to Fresno on March 2, 1939, to collect the account. At that time he obtained from the debtor an order for $1,400 upon the Commercial Credit Company with whom the debtor had an arrangement under which that company purchased the debtor's accounts receivable, paying 75 per cent of the face value and retaining a contingent reserve of 25 per cent. The order was accepted by the Commercial Credit Company on March 3, 1939. The second alleged preference arose out of a check for $506.36 given to defendant's agent by the debtor on March 2, 1939, postdated to March 6, 1939. The debtor sold its merchandise by bulk sale, pursuant to a notice thereof recorded on March 15, 1939. The check was refused payment by the drawee bank for insufficient funds and a second check was likewise refused payment. On March 21, 1939, the debtor sent defendant a certified check for $556.35, in full settlement of the account.

The bankruptcy law with reference to preferences reads: "(a) A preference is a transfer, as defined in this title, of any of the property of a debtor to . . . a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing . . . against him of the petition in bankruptcy, . . . the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class. . . . (b) Any such preference may be avoided by the trustee if the creditor receiving it . . . has, at the time when the transfer is made, *reasonable cause to believe that the debtor is insolvent.*" (Emphasis added.) (11 U.S.C.A., sec. 96(a)(b).) ■ The elements necessary to establish a voidable preference under the foregoing section have been stated to be four and sometimes five in number, depending upon the grouping. (Remington on Bankruptcy [5th ed.] vol. 4-A, secs. 1657-1658, pp. 91-94.) Each and every one of those elements, and the parts thereof, must be established by the trustee in order to avoid a transfer. (11 U.S.C.A., sec. 96; *Haas* v. *Sachs*, 68 F.2d 623; Collier on Bankruptcy, sec. 60, pp. 1248-1249.) Particularly, it is necessary that the plaintiff trustee in bankruptcy establish that

the creditor, at the time of the transfer, has reasonable cause to believe that the debtor is insolvent. (11 U.S.C.A., sec. 96(b); *Patrick* v. *Rice*, 98 F.2d 550; *Cusick* v. *Second Nat. Bank*, 115 F.2d 150.) ■ That issue is essentially one of fact for the trier of fact, including the facts proved and all reasonable inferences which may be drawn from them. ■ If there is any substantial evidence supporting the finding of the trier of fact, it is conclusive on appeal. (*Kaufman* v. *Tredway*, 195 U.S. 271 [25 S.Ct. 33, 49 L.Ed. 190]; *Pyle* v. *Texas Transport etc. Co.*, 238 U.S. 90 [35 S.Ct. 667, 59 L.Ed. 1215]; *Boston Nat. Bank* v. *Early*, 17 F.2d 691; *Westcott* v. *Nixon*, 132 Cal.App. 490 [23 P.2d 75]; 8 C.J.S., Bankruptcy, sec. 215; Remington on Bankruptcy [5th ed.], vol. 4-A, sec. 1707.)

In the instant case the court found that defendant had no reasonable cause to believe that the bankrupt was insolvent at the time of either of the transfers. Hence if there is any substantial evidence to support that finding, it will not be disturbed.

The cases decided under the Bankruptcy Act of 1867 are pertinent generally (Remington on Bankruptcy (5th ed.), vol. 4-A, sec. 1705) and under the act of 1910, inasmuch as it was held that to show reasonable cause to believe that the enforcement of a transfer would effect a preference, it first must be shown that the creditor has reasonable cause to believe the debtor insolvent. (Remington on Bankruptcy (5th ed.), vol. 4-A, sec. 1706.) ■ The general rule in regard to what constitutes reasonable cause is stated in *Grant* v. *First National Bank*, 97 U.S. 80, 81 [24 L.Ed. 971]; "Some confusion exists in the cases as to the meaning of the phrase, 'having reasonable cause to *believe* such a person is insolvent.' *Dicta* are not wanting which assume that it has the same meaning as if it had read, 'having reasonable cause to *suspect* such a person is insolvent.' But the two phrases are distinct in meaning and effect. It is not enough that a creditor has some cause to suspect the insolvency of his debtor; but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure. It was never the intention of the framers of the act to establish any

such rule. A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it—and yet such belief as the Act requires may be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances is not prohibited by the law. Receiving payment is put in the same category, in the section referred to, as receiving security. Hundreds of men constantly continue to make payments up to the very eve of their failure, which it would be very unjust and disastrous to set aside. And yet this could be done in a large proportion of cases if mere grounds of suspicion of their solvency were sufficient for the purpose. The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding. To overhaul and set aside all his transactions with his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the Bankrupt Law an engine of oppression and injustice. It would, in fact, have the effect of producing bankruptcy in many cases where it might otherwise be avoided. Hence the act, very wisely, as we think, instead of making a payment or a security void for a mere suspicion of the debtor's insolvency, requires, for that purpose, that his creditor should have some reasonable cause to believe him insolvent. He must have a knowledge of some fact or facts calculated to produce such a belief in the mind of an ordinarily intelligent man.''

Plaintiff points to the following circumstances as contrary to the finding of the trial court: That defendant knew that the debtor's account was over four months delinquent and did not ship any materials to it for that reason; that reports from Dun & Bradstreet, a credit rating agency, showed the bankrupt was slow in paying its obligations, one account being over six months in default, and that its accounts with the debtor should be watched closely; that on March 15, 1939, that organization advised defendant that the debtor was go-

ing to have a bulk sale of its stock in trade, and on March 21, 1939, an investigator found that the sale was to be made for $1,400; that defendant's agent contacted the debtor to obtain a settlement and found the latter's place under attachment; that a settlement was made as heretofore stated; that the check first given and above mentioned was postdated from March 2 to March 6, and was not paid when presented to the bank on two successive occasions because of insufficient funds; that insistent demands were made to have the check covered; that thereafter a certified check for the balance was given; and that defendant was notified by Dun & Bradstreet of the bulk sale.

On the other hand, there is evidence that in September, 1938, the credit rating by Dun & Bradstreet of the debtor was $27,351.45, their report stating that although the bankrupt's position was "weak," "The various houses to whom credit is extended are gradually being weeded out and he [debtor's agent] claims that the accounts receivable are all good. . . . Business is done with a more selective group' of customers and collections improving," but that current obligations, however, were heavy; that on September 30, 1938, a summary of six creditors of the debtor showed "two as slow 30, satisfactory," one as "slow 30," one as "slow 60," one as "slow 180, unsatisfactory," and one, no payments. In a report on January 12, 1939, it appeared that the debtor's president had advised Dun & Bradstreet that its worth was $30,000, that special effort on collections was being made and credit sales were being curtailed; that although the current position was "relatively weak" and the account was being watched, he was being sold by his supply houses. Defendant's account with the debtor rose from $1,608.28, due in October, 1938, to $3,207.53, due in December, 1938. On January 3, 1939, a $1,000 payment was made. When defendant's agent called for a settlement on March 2, 1939, he learned for the first time of the attachment and then only to the extent that it embraced the debtor's principal assets at its place of business. The attachment was released on March 3, 1939. The debtor's agent stated that he told defendant's agent on the March 2nd occasion that if all the creditors worked with the debtor the attachment could be lifted, that it would be lifted, and that all the creditors would cooperate. The debtor did not advise defendant that it had bad accounts, or that the building in which business was transacted was worth only

$1,500 instead of over $6,000, as reported to Dun & Bradstreet. When the order on the Commercial Credit Company and the check were given, the debtor said it was going to stay in business. On March 15, 1939, the debtor wrote to defendant, stating: "We have decided to discontinue our Fresno yard and become strictly a wholesale and commission account. This will relieve us of carrying an inventory at Fresno and also relieve us of considerable overhead. The company is not quitting business but is changing its policy of operation." Defendant's agent stated that he believed the debtor to be solvent because he did not believe $30,000 would be dissipated in two months. The debtor had never said anything to defendant about being forced into bankruptcy until after the transfers. When the debtor's check was not paid the debtor wrote to defendant on March 11, 1939, as follows: "We have been doing our best to get you the $500.00 but it has been very slow. The Commercial Credit have acknowledged your order and in the meantime have notified our customers to remit to them. Consequently we are not receiving our portion of the payments until the Commercial Credit Company and your order have been paid. We will send you the money at the earliest possible date and in the future will issue no post dated checks. If I should be in San Francisco in the next few days I will call you. Your co-operation is appreciated."

We cannot say as a matter of law that the finding is not supported by the evidence or that defendant had reasonable cause to believe the bankrupt insolvent or knew of facts that put it on inquiry to make further investigation. That conclusion is indicated by holdings that certain factors do not necessarily establish cause for belief of insolvency. The factual background of the following cases is not the same as in the case at bar, but the principles stated are of some assistance. Various circumstances have been held to not necessarily show grounds for reasonable belief, such as mere doubt of solvency. (*In re Salmon*, 161 C.C.A. 308 [249 F. 300]), anxiety about the claim on the part of the creditor and a strong desire to have it paid or demands for payment by another creditor (*Valley Nat. Bank* v. *Westover*, 112 F.2d 61). A finding on that subject contrary to the asserted preference will not be disturbed where "It must be remembered that a man who is always short in cash is only a man who has no free capital. It does not follow necessarily, as both sides con-

cede, that he is insolvent because he is not quick pay. However, the fact that a man in business is not able to pay up when he is pressed in many cases may well be a ground for inquiry, and even for sufficient suspicion of insolvency to justify a suit like this, as, for example, in the case of a large business conducted with prudence and accuracy; but it does not seem to me that, in the case of a man who concededly did business in such an unbusinesslike way as this bankrupt, shortness of cash and absence of free capital, continuing for so long a period of time without any insolvency, ought to be enough to put on inquiry all those who dealt with him. It must be remembered that something more than suspicion is necessary.'' (*Brookheim* v. *Greenbaum*, 225 F. 635, 637, aff'd 141 C.C.A. 891 [225 F. 763].) It is said in *Stucky* v. *Masonic Savings Bank*, 108 U.S. 74, 75 [2 S. Ct. 219, 27 L. Ed. 640: ''That case [referring to *Grant* v. *National Bank*, 97 U.S. 80 (24 L.Ed. 971)] establishes the doctrine that a creditor dealing with a debtor whom he may suspect to be in failing circumstances, but of which he has no sufficient evidence, may receive payment or security without violating the bankrupt law. He may be unwilling to trust him further; he may feel anxious about his claim and have a strong desire to secure it, yet such belief as the act requires may be wanting. Obtaining additional security or receiving payment of a debt under such circumstances is not prohibited by law.''

The fact that the debtor sells out his business does not necessarily put the creditor on inquiry to do more than demand payment of his account. (*Newman* v. *Tootle-Campbell Dry Goods Co.*, 174 Mo.App. 528 [160 S.W. 825].) In the instant case the debtor indicated that he did not intend to discontinue business entirely. ▮ Mere suspicion of insolvency (*Grant* v. *National Bank, supra; Gray* v. *Little*, 97 Cal. App. 442 [275 P.870]) or the facts that the creditor knows his debtor is financially embarrassed and that he is pressing him for payment are not sufficient (*Gray* v. *Little, supra*).

Plaintiff urges that the postdating of the first check given him and the refusal by the bank to pay it on two occasions conclusively established reasonable cause to believe the debtor was insolvent and to put defendant to the duty of making inquiry. It may be inferred from the evidence that the lack of funds to pay the check was not necessarily an indication of insolvency but rather that the debtor's collections on his accounts receivable were slow and hence that the

debtor was short of ready cash. ▮ Shortage of cash would not necessarily indicate to a reasonably prudent business man that the aggregate of the debtor's property, exclusive of that which he may have transferred with intent to hinder or delay his creditors, was not at a fair valuation sufficient to pay his debts. ▮ Upon defendant's insistence that the check be covered, the debtor explained concerning his collections and indicated that it would be made good. The cases cited by plaintiff do not hold that under all circumstances the postdating or refusal of payment of the debtor's check conclusively establishes reasonable cause to believe the debtor insolvent or to put the creditor on inquiry. In *Williams* v. *Plattner*, 45 F.2d 467, it was held that a prima facie case was made out and other circumstances were present. In *Irving Trust Co.* v. *Textile Banking Co.*, 3 F.Supp. 816, *Bronner* v. *Safinna*, 25 F.Supp. 791, and *Smyth* v. *Kaufman*, 114 F.2d 40 [130 A.L.R. 951], additional circumstances were also involved. Moreover, the Smyth case was an affirmance of the trial court's finding of reasonable cause to believe. Each case must be decided on its particular facts, a matter within the province of the trier of fact.

▮ It is immaterial that the court made no finding upon the issue of the debtor's solvency at the time of the alleged preferential transfers. We have seen that all the elements specified in the bankruptcy law (11 U.S.C.A., sec. 96) must be established to avoid a transfer. The finding that defendant did not have reasonable cause to believe the debtor insolvent was against plaintiff and is supported by the evidence. That element lacking, no recovery may be had regardless of whether the debtor was solvent or insolvent. If solvent, the element of insolvency would be lacking. Even though the debtor was insolvent, the element of lack of reasonable cause to believe it was insolvent, is lacking. A finding on the subject would not alter the result in the case. "In other words, when the facts found support the judgment, an omission to find upon an issue when a finding would not necessitate any change in the judgment is not prejudicial error which warrants a reversal or new trial." (24 Cal.Jur. 943.)

▮ Whether or not it was error on the part of the trial court to refuse to admit in evidence the schedules, claims, inventory and appraisement filed in the bankruptcy proceeding, and the testimony of the trustee of the value and col-

lectibility of the debtor's accounts receivable, need not be determined. If there was error, it was not prejudicial. There was other evidence given by plaintiff on the issue of insolvency of the debtor and, as we have seen, even if the debtor was insolvent it still was necessary to prove that the defendant had reasonable cause to believe that such insolvency existed, upon which subject the court found adversely to plaintiff.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Traynor, J., Schauer, J., concurred.