CARROLL NOTION Co., et al. *v.* NEVILLE.

May 25, 1953

No. 38714 33 Adv. S. 7, 10 65 So. 2d 140

700

May 25, 1953 33 Adv. S. 7 65 So. 2d 146

*Lester E. Wills,* for appellant.

*Roger B. Shows,* for appellee.

McGEHEE, C. J.

On April 3, 1950, the appellee, Billie Neville, as Trustee of Sam O. Morris, a bankrupt, formerly doing business as South Side Food Store, at Meridian, Mississippi, filed one suit to recover the sum of $325 from the Carroll Notion Company, a corporation-creditor of the bankrupt, and another suit to recover the sum of $692 from W. J. Warren and J. E. Whitlock, partnership-creditors, and which sums of money represented funds paid to them as alleged voidable preferences, under the Bankruptcy Act.

Both suits were filed in the County Court of Lauderdale County, and by agreement of the parties they were tried as one cause. Under the stipulations entered into at the trial in that behalf, the testimony of Sam O. Morris, the bankrupt, and of Carroll Culpepper, President of the appellant Carroll Notion Company, and of the appellants W. J. Warren and J. E. Whitlock, which had been theretofore taken before John W. Savage, Referee in Bankruptcy, on January 9, 1950, was transcribed, certified to, and used as the testimony on the trial in the county court, and the petition and schedules filed by the bankrupt were by agreement considered as being in evidence. In other words, the two causes were considered and determined by the county court upon the transcript of the testimony of the said witnesses as taken before the Referee in Bankruptcy and upon the petition and schedules filed by the bankrupt, without further evidence being heard by the county judge.

A jury having been waived, the county judge rendered a judgment against the respective appellants on two grounds for the amount sued for in each case. First, he reached his conclusion that the said Sam O. Morris was

insolvent on November 1, 1949, at the time of the transactions between him and the appellants, respectively, from a mere reading of the petition and schedules in bankruptcy that were filed on November 3, 1949, the benefit of which the appellants did not have at the time each were alleged to have received a preference in the transactions complained of between them and the debtor, immediately prior to the adjudication in bankruptcy. Second, the county court based its avoidance of the alleged preferences on the ground that the appellant-creditors had reasonable cause to believe that the debtor was insolvent on November 1, 1949, or to believe that the enforcement of the transfer to them of the property that they received would, in fact, effect a preference.

There were separate appeals to the circuit court by the appellant, Carroll Notion Company, and by the appellants, W. J. Warren and J. E. Whitlock, where the judgments of the county court were affirmed on the appeal record.

Section 60b of the Act of Bankruptcy of 1898, as amended in 1910, 11 U. S. C. A., Section 96(b), provides in part as follows:

"If a bankrupt shall . . . have made a transfer of any of his property, and if, at the time of the transfer . . . and being within four months before the filing of the petition in bankruptcy . . . the bankrupt be insolvent and the . . . transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such . . . transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person."

In construing this provision of the Bankrupt Act in the case of Sams v. First National Bank, 182 Miss. 777, 181 So. 320, involving the right of a bank to set off its debt against a bankrupt's deposit, a different factual situation than the ones here involved, we said that:

██ ██ "What constitutes 'reasonable cause to believe' depends on the facts and circumstances of each particular case. Actual knowledge or belief is not necessary; it is sufficient if there is knowledge or notice of facts or circumstances such as would lead a person of reasonable prudence to believe that the debtor is insolvent, or as would put a person of ordinary caution, or of reasonable prudence, or inquiry which would lead to knowledge of insolvency. This view is fully sustained in the recently published Corpus Juris Secundum, vol. 8, on the subject of Bankruptcy, pp. 705-719, section 215, inclusive, which is in accord with the other texts and the decisions of the courts on this question."

In 6 Am. Jur. 1175, Section 1049, it is said: ". . . it may be said that ██ ██ the elements of a voidable preference are a transfer of the property of a debtor to a creditor on account of an antecedent debt, the insolvency of the debtor at the time of the transfer, the occurrence of the debtor's bankruptcy within four months, advantage obtained by the creditor over other creditors of the same class, and reasonable cause on the part of the creditor to believe the debtor to be insolvent. The absence of any of the requisite elements of a voidable preference prevents a recovery by the trustee of the property transferred."

We are concerned on this appeal only with the sufficiency of the proof as to the existence of the two elements of voidable preference last above enumerated since the first three elements were fully established beyond question. ██ ██ The burden of proof as to the last two elements, that is to say that an advantage was obtained by the creditor over other creditors of the same class, and that the creditor had reasonable cause to believe the debtor to be insolvent, was upon the trustee in bankruptcy to the same extent that he carried the burden as to the first three elements above stated. 6 Am. Jur. 1256, Section 1174. Moreover, ██ ██ "When a debtor pays, and a creditor receives, the amount of a just debt, the natural

presumptions are in favor of the good faith of the transaction.'' 6 Am. Jur. 1257, Section 1175.

There is no substantial conflict in the evidence on the two issues that are presented for determination on this appeal. The proof discloses that the debtor, Sam O. Morris, went into a retail grocery business during the year 1946 or early 1947, and that he used $2,000 of his own funds and $3,000 that he borrowed from his mother in establishing this business. The enterprise proved to be both successful and profitable. But at some time prior to March 1949, the approximate time not being shown by the evidence, the said Morris undertook to expand his business activities by also engaging in a wholesale enterprise. This venture was of short duration and resulted in the debtor sustaining financial losses to such an extent that he had to discontinue this business during the early part of March 1949. However, he continued to successfully operate his retail grocery business until the date of the filing of the voluntary petition in bankruptcy on November 3, 1949.

In the meantime it does not appear from the evidence that the debtor was pressed by any of his creditors on the accounts incurred in the wholesale business to the extent of being sued on any of them. About sixty days prior to being adjudicated a bankrupt, the debtor had caused an attorney to write a number of his nonresident creditors and propose that he turn over to the attorney $150 per month to be prorated among these creditors according to the amount of their claims until he could fully pay off the old accounts of the wholesale business; but it is not shown that the appellants, Carroll Notion Company, or Warren and Whitlock, knew of this proposition made to nonresident creditors at the time the appellants had the transactions with the debtor hereinafter mentioned, two days before the filing of the petition in bankruptcy. Moreover, the debtor had kept his retail grocery store accounts with the appellants cur-

rently paid at all times subsequent to the discontinuance of his wholesale business.

As to the alleged preference in favor of the appellant, Carroll Notion Company, it appears that Carroll Culpepper, president of such company, had sold the debtor an adding machine and a cash register, several months prior to his bankruptcy, and that he still owed $125 on the price of the cash register. That about thirty or forty days prior to the bankruptcy, the debtor and this creditor had some conversation in which the debtor informed the creditor that he intended to contract his business and get along on fewer fixtures and equipment. This creditor knew that the debtor had taken employment to operate a fruit truck to and from Florida and that his wife was operating the retail grocery store in their efforts to liquidate the losses that he had sustained in the unfortunate wholesale venture several months prior thereto. Under the circumstances there was no cause for the creditor, who bought and sold such second-hand equipment, to become suspicious in regard to the desire of the debtor to dispose of such of his equipment as he could dispense with as unnecessary to his business, in order to reduce this old indebtedness.

The creditor had been purchasing a good portion of his own groceries from the debtor and they had settlements on their mutual dealings two or three times a year, the creditor having testified that about two-thirds of the time he owed the debtor more than the latter owed him. The creditor knew that the debtor was keeping his current retail grocery accounts paid. He was in the grocery store frequently and observed that the debtor appeared to have a good business.

On November 1, 1949, the debtor sold to this creditor two adding machines, one cash register and a cold drink box for the total sum of $550, telling him at the time, in effect, that he was trying to get along without such equipment as he did not actually need. He then owed the creditor $325. He received a check for $550 from the

creditor, endorsed the same and the creditor paid him the difference of $225 which the debtor on that day used in paying the account of the Corr-Williams Tobacco Company in Meridian which amounted to slightly more than $225.

There is no proof that the creditor knew that the debtor's liabilities were in excess of his assets, and there is no proof addressed to the theory that the creditor had good reason to believe that this transfer or sale of this equipment would result in this creditor obtaining payment of a larger percentage of its claim than would be received by other creditors of the same class. Nor is there any proof that such was in fact the result, it not having been shown as to what other claims were proved against the bankrupt estate or what per cent of each was paid.

As to the alleged preference in favor of Warren and Whitlock, it appears that while the debtor was operating both the wholesale and retail business he incurred an indebtedness of several hundred dollars to these creditors, but knew only Whitlock in the transaction, since Warren operated a retail grocery store in another part of the city and was only a silent partner of Whitlock as to the indebtedness contracted with the latter by the debtor. Both Whitlock and Warren knew that the debtor had lost considerable money in his wholesale venture, had discontinued the same, but thereafter continued to operate his retail grocery business and to keep his current bills with them fully paid. He had been slowly reducing the account that he had contracted with Whitlock in the wholesale business by paying a small amount thereon each month. They knew that he had been unable to pay off the accounts that he had incurred in the wholesale business, but, as heretofore stated, none of his creditors were pressing him on account thereof but kept selling him shipments to his retail store, except that possibly Armour & Company had quit shipping him except C. O. D. ██ But inability on the part of a debtor to

presently pay his bills is not the test of insolvency. For instance, it is stated in Collier in Bankruptcy, Vol. 3, at p. 988. ". . . mere inability to meet current obligations is not insolvency in the bankruptcy sense, which is the excess of liabilities over assets at a fair valuation."

The debtor had learned that Warren was interested in buying a walk-in Frigidaire in which to hang fresh meat for preservation pending the sale thereof. Desiring to rid himself of equipment that he could get along without, as he represented the situation to Warren, the debtor called the latter by telephone and induced him to come to his place of business to look at such a Frigidaire and also a vegetable display case. The debtor did not owe Warren anything so far as he then knew, since he thought that his indebtedness was owing exclusively to Whitlock. Thereupon, Warren examined the equipment and paid the debtor $1,600 therefor. The walk-in Frigidaire had originally cost $775, and the vegetable display case $1,300. No contention is made that the two pieces of equipment were sold for less than the fair market value of such used equipment. The $1,600 was paid in two checks, wherein the debtor was named as payee. One check was for $900 representing a balance due to the Commercial Credit Corporation on the vegetable display case. The debtor endorsed this check and left it with Mr. Warren to be delivered to the Commercial Credit Corporation in satisfaction of a contractual lien thereon. The other check was endorsed by the debtor, and then cashed by Warren, who, at the request of the debtor, retained $692 for the account which the debtor thought was due to Whitlock alone. At that time, the debtor had learned that Whitlock was out of town, and knowing that Warren and Whitlock were interested together in a frozen locker food store, requested that Warren deliver the $692 to Whitlock in settlement of the debtor's account.

The debtor's expressed desire to dispose of this expensive equipment and to try to get along on more eco-

nomical equipment was entirely consistent with his apparent determination to carry out his declared purpose of paying all of his creditors "100 cents on the dollar," as indicated by his willingness to take the job of driving a fruit truck to and from Florida while his wife operated the grocery store.

Of course, the debtor knew at the time of these transfers two days before going in bankruptcy that he would not be able to avoid taking advantage of the bankruptcy act, but the question is whether or not the proof is sufficient to show that these creditors knew, or had probable cause to believe, that he was insolvent, or that these transfers would result in their obtaining payment of a larger per cent of their claims than the debtor would later be able to pay to the other creditors of the same class. The debtor in his testimony agreed that Warren and Whitlock knew that he was in a financial strain, but he further testified that no one knew his financial condition other than himself. These creditors knew that more than eight months prior to these transfers, the debtor had discontinued his wholesale business because he was losing money in connection therewith, but they also knew that he had weathered the storm for several months and was meeting his current bills as hereinbefore stated and that he had been slowly reducing his indebtedness to them. But there is no proof in the record to show that they had probable cause to believe that his liabilities exceeded his assets, as was made known by the debtor two days later when he filed his petition and schedules in bankruptcy.

What is said in the foregoing paragraph as to the knowledge, or lack thereof, by Warren and Whitlock as to the insolvency, etc. of the debtor is equally applicable to the Carroll Notion Company.

In Fly & McFall v. Watts, 209 Ark. 282, 190 S. W. 2d 533, the Court quoted with approval from Remington on Bankruptcy, 5th Ed., Section 1710, the following: **(Hn 6)** "Mere suspicion is not enough, even if it has led the

creditor to refuse further credit. . . . Mere doubt of solvency is not enough. A creditor may feel anxious about his claim, and have a strong desire to secure it or have it paid, and yet not have such belief as the Act requires . . .''

The proof taken before the Referee in Bankruptcy, and the transcript of which was used in the county court in these two cases was directed primarily to the question of the insolvency of the bankrupt and whether or not these creditors had probable cause to believe that the debtor was insolvent, but there is no proof in the record that the alleged preferential payments to these creditors enabled them to obtain a larger percentage of their claims than was received by other creditors of the same class; and this deficiency of proof on one of the essential elements of the right of action created by the bankruptcy act to void a preference, prevents the trustee from recovering the sum sued for in each of these cases.

Moreover, we do not think that the proof is sufficient to show that these creditors had reasonable cause to believe that the defendant was insolvent at the time of the transfers in question. They merely knew that the debtor could not then pay all of the bills that he owed, because of the losses that he had sustained in a venture that was discontinued several months prior thereto. On the other hand, the record discloses that they had good reason to believe that his course of conduct, and the past attitude of his creditors in not bringing suit or otherwise pressing their claims, would enable him to eventually pay off his indebtedness in full.

Moreover, in determining the ''fair valuation'' of his assets as contemplated by the statutory definition it was not what the property might bring at a forced sale, but its value taken in relation to the business as a going concern. In Re Nathanson Brothers Company, 64 Fed. 2d 919; Empire State Trust Company v. William F. Fisher Company, 67 N. J. Eq. 88, 57 Atl. 502. The debtor's schedules in bankruptcy filed two days after his

transfers of property to the appellants listed his assets, in addition to property claimed as exempt, at the value of $18,076.98 and his unsecured indebtedness at $10,-809.87. He actually owed on both secured and unsecured debts the sum of $21,339.64, but it was not shown that these appellants knew, or had good reason to believe, that such was the financial status of the debtor, and there seems to have been nothing to suggest the necessity of an inquiry by these creditors as to how much the debtor owed in comparison with his assets as long as he was meeting the current bills of his retail grocery and was not being sued or otherwise pressed for payment on the bills incurred nearly a year prior thereto in the ill-fated wholesale venture.

The test of insolvency within the Bankruptcy Act is discussed in 6 Am. Jur. 664, Section 166 and Section 167, p. 665. See also Cate v. Certainteed Products Company, 23 Cal. 2d 444, 144 P. 2d 335, and authorities therein cited.

After full consideration of numerous authorities cited in the briefs of both the appellants and the appellee, we are of the opinion that the plaintiff did not meet the burden of proof required in order to set aside the transfers of property in question, and that the judgments appealed from must therefore be reversed and judgments rendered here for the appellants.

Reversed and judgments here for the appellants.

*Hall, Lee, Arrington* and *Ethridge, JJ.,* concur.

---

### ON MOTION TO ELIMINATE PART OF RECORD AND TO REDUCE COST BILL ON APPEAL

McGehee, C. J.

On November 3, 1952, the appellants in this cause filed their motion to eliminate numerous pages of the record as made up by the trial court clerk in duplication of other pages of the record, and to reduce said clerk's cost

bill accordingly at 25¢ per 100 words for the pages proposed to be eliminated. The motion has been passed until the consideration of the entire record on the merits, and we have now concluded that for the most part the motion should be sustained.

■■ ■■ The Court finds that all of Page 9 of the clerk's transcript should be eliminated as being an exact duplicate of what appears on Page 8 thereof, except for the errors and omissions on Page 9; that all of Page 34 should be eliminated as being a duplicate of the last paragraph on Page 33; that all of Pages 130 to 143, inclusive, should be eliminated as being carbon copies of Pages 144 to 158, inclusive; that all of Pages 159 and 160 should be eliminated as copies of irrelevant documents which were not introduced in evidence and were not made a part of the record by stipulation; that all of Pages 164 to 168, inclusive, should be eliminated as being a duplication of all that appears on Pages 39 to 43, inclusive; that all of Pages 169 to 173, inclusive, should be eliminated as a duplication of all that appears on Pages 44 to 48, inclusive; and that all of Pages 174 to 177, inclusive, should be eliminated as copies of the appeal bonds from the county court to the circuit court, there having been no point made in the circuit court upon the trial as to the legal sufficiency of the said bonds and they not constituting a proper part of the record from the circuit court on appeal to this Court. All of the said pages are eliminated for the purpose of recalculating the proper amount of cost to which the circuit clerk is entitled on this appeal, and the said cost bill is ordered reduced to the extent of 25¢ per 100 words for all that which appears on the pages eliminated, as hereinbefore set forth.

The situation revealed in the foregoing paragraph as to duplications in this record are illustrative of what is found in numerous records that are filed here in connection with appeals to this Court. ■■ ■■ It frequently occurs that a few of the trial court clerks, in making up appeal records, will copy subpoenas as issued for all of

the witnesses in the case, together with the return of the officer thereon, and where no point is made at the trial as to the sufficiency of the process. It is to be assumed that when a witness testifies in a case his attendance at court has been procured by some means, and it serves no useful purpose for the process on the witnesses to be copied into the record at the expense of the losing litigant. ██ ██ Nor is it necessary to copy into the record the process on the defendant or defendants in the case unless some question is raised at the trial as to the sufficiency of the summons or the return of the officer thereon.

██ ██ Moreover, many records are enlarged by recopying exhibits to the pleadings as often as they are referred to or introduced during the trial, when it is sufficient to merely make notations at proper places in the record referring to the preceding pages whereon the same have already been copied.

Suggestions to trial court clerks have been furnished from time to time by the Clerk of this Court, and at our instance, to enlist their cooperation in eliminating unnecessary costs to litigants on appeals. A great majority of the clerks are observing these suggestions, but with the change in personnel of the clerks' offices, ██ ██ it becomes necessary to re-emphasize the need of including only such matters as are material to the determination of the cause here on appeal, such as the pleadings, indictment, evidence, motions, orders, instructions, judgment, indexes to the record, etc. without duplication and other unnecessary enlargement of the record.

The motion in the instant case further seeks to have Pages 49 to 52, inclusive, eliminated as being a duplication of a stipulation appearing on Pages 35 to 38, inclusive. ██ ██ However, we find that while the stipulations are verbatim in most particulars, the same are different as to names of the parties, and are separately styled; that while one stipulation could have been entered into covering both cases when they were being tried as one

cause, the fact remains that counsel entered into two separate stipulations and the same are different as to the names of the respective parties mentioned therein. Hence, the clerk was justified in copying both stipulations. And there are other minor particulars as to which we are not sure the motion should be sustained.

The motion is therefore sustained to the extent hereinbefore set forth in the second paragraph hereof, and overruled in other respects.

*Hall, Lee, Arrington* and *Ethridge, JJ.,* concur.