[L. A. No. 20686.  In Bank.  Aug. 4, 1950.]

JACK STANLEY, Respondent, v. COLUMBIA BROAD-
CASTING SYSTEM, INC.  (a Corporation), Appellant.

O'Melveny & Myers, Homer I. Mitchell, W. B. Carman, Jr., Louis W. Myers and Deane F. Johnson for Appellant.

Loeb & Loeb and Herman F. Selvin, Amici Curiae on behalf of Appellant.

Harold A. Fendler and John W. Preston for Respondent.

CARTER, J.—Defendant has appealed from a verdict and judgment for $35,000 given by a jury in favor of the plaintiff. The action was brought to recover on an alleged implied agreement of defendant to pay plaintiff for a radio program which plaintiff claims to have originated.

In his complaint, plaintiff alleged that during the year 1941 he originated and caused to be prepared, composed and written an original script for a radio program entitled ''Walter Wanger Presents'' and a radio program format entitled ''Preview Parade'' or ''Hollywood Preview'' and that about September 1st of that year he had this script recorded for the purpose of submitting it to prospective sponsors, advertising agencies and broadcasting companies. He alleged that he, at all times, retained full ownership of the radio program and that he at no time licensed or authorized the use of it in any manner. Plaintiff further alleged that during the years 1942, 1943 and 1944 he submitted to the defendant, Columbia Broadcasting System, Incorporated, the radio program, script, format and records for the purpose of having the defendant determine whether or not it desired to purchase it or license the right to use it under an implied agreement that if the defendant did use the radio program it would pay plaintiff its reasonable value. But that on or about the first of May, 1945, the defendant produced and presented a radio program entitled ''Hollywood Preview'' which substantially copied and embodied plaintiff's radio program and, as a result, became indebted to the plaintiff for the use thereof.

On this appeal, defendant contends that the court should have found, as a matter of law, that there was no similarity between the two programs; that the evidence was insufficient to show that defendant had access to plaintiff's program idea; that there can be no implied agreement to pay for an abstract idea which is not new or novel; that the jury arbitrarily ignored the uncontradicted, unimpeached testimony of defendant's witness, Hudson; that when an idea is made public there can be no liability for its use; that its motion for a new trial on the grounds that (1) the jury's verdict for damages was so excessive that it appeared to have been given under the influence of prejudice and passion, (2) newly discovered evidence, and (3) that the evidence was insufficient to support the verdict should have been granted.

■ As a general observation from the cases, it may be stated that the right of the originator of an idea to recover from one who uses or infringes it seems to depend upon whether or not the idea was novel and reduced to concrete form prior to its appropriation by the defendant, and, where the idea was disclosed by the originator to the appropriator, whether such disclosure took place under circumstances indi-

cating that compensation was expected if the idea was used.

Where these prerequisites exist, recovery may be had upon a theory of contract implied in fact or in law. (*Plus Promotions* v. *R.C.A. Mfg. Co.*, (N.Y.) 49 F.Supp. 116; *Alberts* v. *Remington Rand*, 175 Misc. 486 [23 N.Y.S.2d 892]; *Healey* v. *R. H. Macy & Co.*, 251 App.Div. 440 [297 N.Y.S. 165], aff'd. 277 N.Y. 681 [14 N.E.2d 388].)

Plaintiff's complete program is as follows:

"Announcer: 'Ladies and gentlemen, WALTER WANGER PRESENTS Hollywood Preview! Hollywood Preview! Hollywood Preview!

" 'And here is Hollywood's distinguished producer, Walter Wanger.'

"Wanger: 'How do you do, ladies and gentlemen. Welcome to our Hollywood Preview Parade, a radio show designed for your pleasure and to give you a voice in what pictures Hollywood shall produce in the months to come. Hollywood is very interested in giving you motion pictures you want to see. Unfortunately producers do not and cannot always know just what you do want. This is the reason for this "Preview Parade." Each week we plan to present a radio story we think will make a good film. We ask you to send us your opinion and suggest players for the leading roles. Our sponsor will give worthwhile cash prizes for the best letters, but more about that later.

" 'Now allow me to introduce Mr. True Boardman.'

"Boardman: 'This is the sixth program of the new series, "Walter Wanger Presents." Your host is one of Hollywood's most progressive film leaders, the President of the Academy of Motion Picture Arts and Sciences, and producer of such outstanding films as Foreign Correspondent, Blockade, Long Voyage Home, Stagecoach, Algiers, and currently Sundown.

" 'Each week Mr. Wanger selects a story which he feels should be made into a picture. You are asked to write to Mr. Wanger and give him your opinion. The sponsors pay $500 for the best letter written by one of our listeners and if enough of you vote for it our play will be produced as a motion picture.

" 'And now, once again, Walter Wanger.'

"Wanger: 'Thank you, Mr. Boardman. Tonight our play is entitled "So Gallantly Gleaming." It has been written by Harvey Thew, Peter Ordway, and Sonya Levien. The radio adaptation is by Hector Chevigny.

" ' "So Gallantly Gleaming" tells a thrilling and romantic story of a great explorer, his beautiful wife, and the acquisition of California. Listen closely. Do you think it should be made into a motion picture? Your votes will decide.

" ' 'Our guests who will later give their opinion are Miss Joan Bennett, Hector Chevigny and Henry Hathaway. Music is by Robert Armbruster.' "

## DRAMA

"Boardman: 'Thank you, ladies and gentlemen. Did you like "So Gallantly Gleaming"? Would you like to see it as a motion picture? The story of John Charles Fremont, I think, is one that deserves retelling. In a moment we will hear the opinion of our three Hollywood guests, Joan Bennett, Hector Chevigny, and Henry Hathaway, and then have an opportunity to compare their opinions with yours.

" 'Now again a word as to the real idea behind this program. Each week Walter Wanger Presents brings you a story which we think would be a good motion picture. And here is your part in the program. We ask you to write to Mr. Wanger, telling him whether or not you would like to have this play made into a motion picture, and why. Also include your choice of stars to play the leading roles. The best letter received each·week will receive an award of $500 from our sponsor. The award is based not on the style of your letter, not on brilliant writing, but entirely on the reasons you set down as your opinion. And believe me, Hollywood is waiting for your vote. Whether or not you win a prize, your vote will help decide whether or not to film "So Gallantly Gleaming." The American picture-going public has long said it wished a voice in the choice of stories presented on the screen. Here is the chance for you to have that voice and make it heard across the nation. Write your letter now tonight. Address Walter Wanger, Hollywood, California.

" 'Last week Mr. Wanger presented "Out of the Night," the sensational novel which has attracted such nationwide comment. A storm of argument was aroused. Sixty-eight thousand letters have been received to date, and we are happy to announce that Warner Brothers Studio have arranged to make this startling story into a film in the near future. So, thanks to your letters, you have helped Warner Brothers to their decision to film "Out of the Night."

" 'Last week's best letter was from Mrs. William Wentworth

of Brockton, Massachusetts. Congratulations, Mrs. Wentworth! Your check for $500 goes forward immediately.

" 'Now, Mr. Wanger, I think we are all anxious to hear the opinions of your guests about tonight's show.'

(Interview with Board of Experts)

"Wanger: 'Thank you. Thank you very much. Thank you, Joan Bennett, Henry Hathaway, Hector Chevigny. Do you ladies and gentlemen, agree with the opinions of our guests? Do you agree that "So Gallantly Gleaming" should become a motion picture? And who do you think should play the leading roles? Won't you write and tell us. Remember that whether your letter is best and wins the prize or not, you are helping Hollywood decide on what to give you on the screen. Next week we will have something totally different for you, a story called "Two Arabian Knights." Until then, this is Walter Wanger saying, Good night.'

"Announcer: 'Walter Wanger Presents is brought to you at this same time each week by our sponsor. Original music for tonight's show was written and directed, as always, by Robert Armbruster. The cast included Hollywood's outstanding radio stars—Lurene Tuttle, Lou Crosby, Norman Field, Elliott Lewis, Lou Merrill, Frederick Shields, Paul Whitley, Norene Gamille, Gayne Whitman.

" 'This is John Hiestand hanging out the "Goodnight" sign until we meet again next week at this same time. This is the National Broadcasting Company.' "

The following is a portion of the broadcast preceding and following the drama as actually put on the air by defendant:

"Announcer: 'It's The Flying Red Horse . . . the sign that identifies the *Mobilgas* and *Mobiloil* dealers who bring you . . . "HOLLYWOOD PREVIEW" . . . with Mr. Otto Kruger!'

"Announcer: 'Tonight, on behalf of your Mobilgas and Mobiloil dealer . . . Mr. Otto Kruger, eminent star of radio, stage and screen brings you another Hollywood Preview of a motion picture of the future! Tonight's story . . . "Growing Pains" . . . a comedy by Aurania Rouveral now scheduled for production by RKO Pictures.

" 'And as our star . . . Miss Marcy Maguire!

" 'Now . . . ladies and gentlemen . . . Otto Kruger!'

"Kruger: 'Thank you. Good evening, everyone. Well, it's another Preview Night here in Hollywood, and Mobilgas invites you to share in the excitement. For just as the first showing of a new motion picture in the film capitol means

bright lights and eager crowds, so does the same spirit of enthusiasm prevail on our radio version of Hollywood Preview. So, tonight, it's ''Growing Pains'' . . . famous as a play . . . and now being prepared for filming at RKO. And as our star . . . well, because ''Growing Pains'' is a story about irresistible youth, we wanted Hollywood's most enthusiastic, effervescent young lady in the leading role of Terry. And we found exactly that in the person of red-headed . . . Marcy Maguire.'

''Announcer: 'And now, ''Growing Pains'' . . .'

''Announcer: 'So ends tonight's Hollywood Preview Story.' ''

(Interview with star follows.)

''Announcer: 'Now, as our theatre audience fills out cards giving their comments and indicating their favorites for the picture version of ''Growing Pains,'' a special word of greeting to some new listeners.' '' (Advertising for sponsor follows; announcements as to producer, director and music.)

▋ The problem of similarity between two compositions, whether literary, musical or dramatic, is a question of fact to be determined ultimately by a comparison of the two works upon the basis of the opinion of the average individual possessing a practical understanding of the subject. Although the majority of the decided cases involved a questioned infringement of a copyrighted work, it would seem that the test of whether or not an infringement existed would be the same as the question here involved—the determination of whether or not such similarity exists between plaintiff's and defendant's programs as to suggest to the average person the use by defendant of an idea originating with plaintiff upon proof of the other elements necessary to enable the plaintiff to recover. The analogy between the two is drawn by the court in *De Acosta* v. *Brown,* 146 Fed.2d 408.

The parties have conceded that the applicable sections of the Civil Code, 980[1] and 983[2] as they read at the time plain-

---

[1] ''Section 980. The author of any product of the mind, whether it is an invention, or a composition in letters or art, or a design, with or without delineation, or other graphical representation, has an exclusive ownership therein, and in the representation or expression thereof, which continues so long as the product and the representations or expressions thereof made by him remain in his possession.''

[2] ''Section 983. If the owner of a product of the mind intentionally makes it public, a copy or reproduction may be made public by any person, without responsibility to the owner, so far as the law of this state is concerned.''

tiff's cause of action arose, are but codifications of the common law. ▮ The common law right in literary property and the right existing under the copyright law are contrasted as follows: "The term 'copyright' is sometimes used to designate the property in intellectual productions conferred by the common law as well as that conferred by statute, the full phrase 'common-law copyright' being sometimes used. The justification for this use of the term at the present day is found only in the fact that the common law confers on the owner of an intellectual production the exclusive right to make first publication of it, that is, the right to copy it in the first instance . . . Whether the common law ever conferred a copyright in the sense of an exclusive right of continued publication and sale has been a matter of doubt and dispute, . . . but however this may be, the range of rights and liabilities existing at common law with respect to intellectual productions is essentially and greatly different from those existing under the copyright statutes. *Bobbs-Merrill Co.* v. *Straus*, 210 U.S. 339 [28 S.Ct. 722, 52 L.Ed 1086]. Speaking generally, common-law rights are limited to unpublished works, and all common-law property rights therein are lost on a publication . . . while statutory copyrights relate mainly to published works, . . . Again, *common law rights in unpublished works are of a wider and more exclusive nature* than the rights conferred by statutory copyright in published works. The common law prohibits any kind of unauthorized interference with, or use of, an unpublished work on the ground of an exclusive property right, and the common-law right is perpetual, existing until lost or terminated by the voluntary act of the owner, . . . while a statutory copyright permits a 'fair use' of the copyright publication, without deeming it an infringement. . . ." [Emphasis added.] (18 C.J.S., Copyright and Literary Property, § 2, p. 138 et seq.; and cases there cited.)

▮ The test, with respect to infringement, which is laid down by the cases is that impression received by the average reasonable man upon a comparative reading of the two works "not by a dissection of sentences and incidents, suitable for the study of a digest or textbook, but inherently unnatural for any man who has the kind of brains that make him able to adapt a work of fiction." (*Frankel* v. *Irwin*, 34 F.2d 142, 144.) (*White-Smith Music Co.* v. *Apollo Co.*, 209 U.S. 1, 17 [28 S.Ct. 319, 52 L.Ed. 655]; 13 C.J. 1113, § 276, n. 30; *Harold*

*Lloyd Corp.* v. *Witwer,* 65 F.2d 1, 18; *Hewitt* v. *Coward,* 41 N.Y.S.2d 498; *Dymow* v. *Bolton,* 11 F.2d 690; *Twentieth Century-Fox Film Corp.* v. *Dieckhaus,* 153 F.2d 893; 15 Cornell L.Q. 633, 639.)

In determining whether the similarity which exists between a copyrighted literary, dramatic or musical work and an alleged infringing publication is due to copying, the common knowledge of the average reader, observer, spectator or listener is the standard of judgment which must be used. (*Echevarria* v. *Warner Bros. Pictures,* 12 F.Supp. 632; *Sieff* v. *Continental Auto Supply,* 39 F.Supp. 683; *Barbadillo* v. *Goldwyn,* 42 F.2d 881, 885.)

With respect to the comparison between the two programs and without unnecessarily "dissecting" them, there appears to be sufficient similarity to justify the finding of the jury as the "average, reasonable man." There are, it is true, certain dissimilarities which appear: The lack of the so-called Board of Experts on defendant's program; the fact that the studio audience only was requested to respond; and the rather less emphasis which is placed on the reaction of the public to the play it has heard. The element of prizes offered for the best letter was incorporated into defendant's program after it had made its first few appearances on the air and was continued for a period of six weeks. Each case must be determined on its own facts. (*Frankel* v. *Irwin, supra.*) "It is of course essential to any protection of literary property, whether at common-law or under the statute, that the right cannot be limited literally to the text, else a plagiarist would escape by immaterial variations. That has never been the law, but, as soon as literal appropriation ceases to be the test, the whole matter is necessarily at large, so that, as was recently well said by a distinguished judge, the decisions cannot help much in a new case. *Fendler* v. *Morosco,* 253 N.Y. 281, 292, 171 N.E. 56." (*Nichols* v. *Universal Pictures Corp.,* 45 F.2d 119, 121.) "Evidence of these differences is relevant upon the question of infringement, but if such differences are shown to exist, the question remains for the trier of fact to decide the issue." (*Universal Pictures Co.* v. *Harold Lloyd Corp.,* 162 F.2d 354, 361.) (*Pellegrini* v. *Allegrini,* D.C., 2 F.2d 610.) "Slight differences and variations will not serve as a defense." (*Universal Pictures Co.* v. *Harold Lloyd Corp., supra,* 361.) (*Fleischer Studios, Inc.* v. *Ralph A. Freundlich, Inc.,* 73 F.2d 276, 278; *Nutt* v. *National Institute Inc. for Imp. of Memory,* 31 F.2d 236, 238.)

We then have a question of fact—that of the similarity between the two programs. This question of fact was decided adversely to defendant by the jury whose duty it was to make the determination. The rule is settled that this determination will not be interfered with upon appeal where there is evidence to sustain it. The evidence, in the form of the two programs alone, shows that there is substantial similarity to support the verdict.

Because of the factual dissimilarity between this case and *Golding* v. *R.K.O. Pictures, Inc.,* L. A. No. 20699, *post,* p. 690 [221 P.2d 95], this day decided, the scope of the inquiry upon the issue of similarity is necessarily different. In each case the issue of similarity was properly submitted to the jury. Similarity having been found by the jury, we look to the evidence to ascertain whether such similarity existed as to the portion of the production which plaintiff claims to have originated. In this case it is the entire plan, the grouping together or arrangement of various elements which constitutes the claimed infringement. In the Golding case it is only the plot or basic dramatic core of the play which is claimed to be original and to have been unlawfully copied by the defendant. It follows that the inquiry in the Golding case is a more limited one than that in the present case because of the nature of the claimed infringement.

The next contention made by the defendant is that the defendant had no access to plaintiff's program idea. There is evidence in the record to show that plaintiff submitted his program to several officials and employees of the broadcasting company at different times during the years 1942, 1943 and 1944. Implicit in this submission was the belief that if the program were used he would be compensated therefor. It was admitted by defendant's witness Hudson at the trial that it was the custom in the radio industry to pay for such ideas when and if they were used.

It is conceded by the defendant in its brief that plaintiff's idea had been reduced to the concrete form of a script format and recording. The next question to be discussed is whether or not plaintiff's idea as such was so new and novel as to be worthy of protection. It may be conceded at the outset that there is nothing new in a play broadcast over the air; it may also be conceded that there is nothing new in the use of the words ''Hollywood Preview'' in connection with the first showing to the public of a *motion picture*; it may also be noted

that audience participation, as such, is not new to radio. But when all of these elements are joined to make one idea for a radio program, it is the *combination* which is new and novel. An author who takes existing materials from sources common to all writers, arranges and combines them in a new form, giving them an application unknown before, is entitled to a copyright, notwithstanding the fact that he may have borrowed much of his materials and ideas from others, provided they are assembled in a different manner and combined for a different purpose, and his plan and arrangement are a real improvement upon existing modes; for the labor of making these selections, arrangements and combinations has entailed the exercise of skill, discretion and creative effort. (*Edwards & Deutsch Lithographing Co.* v. *Boorman*, 15 F.2d 35.) "If the author has accomplished a unique and useful result through the application of intellectual labor and literary or artistic skill, his work is entitled to a copyright which will protect the plan, arrangement and combination of the materials therein, even though all the materials of such work, or some parts of its plan, or the arrangement and modes of illustrating the subject matter thereof, may be found separately or in a different form or setting, or in a different combination in other distinct works." (Ball, The Law of Copyright and Literary Property, p. 247.) (*Barsha* v. *Metro-Goldwyn-Mayer*, 32 Cal.App.2d 556 [90 P.2d 371].) It has been previously pointed out that an author's right in the fruits of his intellectual labor at common law is even broader than that which he has under the law of copyright.

It was admitted by Hudson, defendant's principal witness, that prior to the time the program in question was placed on the air there was no program in which the listening audience in the studio or the listening audience on the radio were asked to give their opinions as to the suitability of the material broadcast by radio for motion picture products. He further admitted that it was a new idea for the listening audience, whether studio, or the entire listening public, to comment on the prospective stars to appear in the proposed productions. The defendant, however, maintains that its studio audience participation was merely atmosphere and was not intended to give the public any real participation in the choice of future pictures. If this was the true intention of defendant, the following excerpt from the testimony of Hudson shows that the studio audience was not so advised nor led to believe:

"Q. When you first put the program on the air starting on May first your studio audience was asked to submit comment first as to whether they thought the material suitable for pictures, and second, the persons they would like to see in the leading roles, isn't that right? A. That is right."

Thus the evidence shows that defendant's principal witness, a man who had been in the radio business for some years, believed that a plan such as plaintiff's was new in the sense that the particular combination of ideas had not before been used in radio. It is also evident that it was the custom in the radio industry to pay for such ideas. ■ Furthermore, the question of originality of plaintiff's program is not one of law to be determined by the court but is one of *fact* for the jury's determination. (*Yadkoe* v. *Fields*, 66 Cal.App.2d 150, 159 [151 P.2d 906]; *Dezendorf* v. *Twentieth Century-Fox Film Corp.*, (C.C.A. 9) 99 F.2d 850, 851; *New York Belting Co.* v. *New Jersey Rubber Co.*, 137 U.S. 445, 450 [11 S.Ct. 193, 34 L.Ed. 741].)

■ The next contention made by defendant is that the jury arbitrarily ignored the uncontradicted, unimpeached testimony of defendant's witness, Hudson. The record shows that this witness' testimony was contradicted and impeached at different times throughout the trial. His testimony with respect to the so-called program evolved by him in 1940 (before defendant had access to plaintiff's work) which it is contended is the one broadcast by the defendant company, is worthy of mention. He testified that the idea back of his program was to promote the sale of stories by authors who could not get a hearing from important motion picture executives. He admitted that he had not considered having any audience participation feature, and, of course, no prize offered for the best letters, nor had he considered the title "Hollywood Preview." It would seem that the audience participation feature, whether the studio audience or the entire listening public, was one of the more salient parts of plaintiff's program. The members of the listening, movie-going public, may well have been sufficiently intrigued with the thought that they were having a voice in the selection of "moving pictures of the future" so as to increase the popularity rating of the program. There was a great deal of testimony at the trial concerning the "Hooper" system of ratings. This is a system used to ascertain the number of listeners tuned in to a particular program. It was also shown at the trial that the percentage of listeners

increased with respect to this particular program after the "prize for the best letter" feature was added. Using the same test here as to the similarity between the program actually broadcast and Hudson's program, it would seem that defendant's contention is without merit. It would not be apparent to the "reasonable man" upon a comparison of the two that there was such similarity to raise the inference that defendant's program was that originated by Hudson in 1940.

Defendant's contention that there can be no liability to pay for an idea which has been made public is without merit when the facts of this case are considered. When plaintiff made his audition recording before an audience in the National Broadcasting Company's studio he was not making his idea "public property" within the meaning of the law. Prior to publication an author may make copies of his production and enjoy the benefit of limited or restricted publication without forfeiture of the right of a general publication. The communication of the contents of a work under restriction, known as a "restricted or limited" publication, is illustrated by performances of a dramatic or musical composition before a select audience, private circulation of the manuscript, etc. (Ball, Literary Property and Copyright, 473; *Werckmeister* v. *American Lithographic Co.*, 134 F. 321, 324 [69 C.C.A. 553, 68 L.R.A. 591]; *Palmer* v. *De Witt*, 47 N.Y. 532, 543 [7 Am.Rep. 480]; *American Tobacco Co.* v. *Werckmeister*, 207 U.S. 284 [28 S.Ct. 72, 52 L.Ed. 208]; *Nutt* v. *National Institute Inc. for Imp. of Memory, supra*; *Ferris* v. *Frohman*, 223 U.S. 424 [32 S.Ct. 263, 56 L.Ed. 492]; *Uproar Co.* v. *National Broadcasting Co.*, 8 F.Supp. 358, aff'd, 81 F.2d 373.)

With respect to defendant's motion for a new trial which was denied by the trial court, various contentions are made by defendant as to why it should have been granted. First, it is said that the jury's verdict was so excessive that it must have been given under the influence of passion or prejudice. There is evidence in the record to show that plaintiff spent several years in the preparation of his idea for a radio program; that he had a recording made of it when the audition was held which entailed the employment of various screen and radio actors, technicians and the like. There is evidence to show that plaintiff's idea was of no value whatsoever to him after its use by the defendant. As was said in *Yadkoe* v. *Fields*, 66 Cal.App.2d 150, 161 [151 P.2d 906]: "Moreover, the implied finding that the nature of the material here in-

volved is such that no value attaches thereto aside from the use thereof, and that once such material is used the value therein is gone, is fully justified by the evidence. . . . Under the circumstances here presented, appellant's contention as to lack of evidence of the value of the use of the material is without merit." The above quoted case involved the affirmation by the District Court of Appeal of a jury verdict of $8,000 damages given for the use of isolated "gags." In the present case, both plaintiff and his expert witness testified as to the estimated worth of the program idea, and as to the custom in the industry to pay the author a certain percentage of the production costs based on the number of weeks a show was on the air. "The fact that personal property which is injured or destroyed by the wrongful or negligent act of another, has no market value, does not restrict the recovery to nominal damages only; its value or the plaintiff's damages must be ascertained in some other rational way and from such elements as are attainable. In such case the proper measure of damages is generally its actual value or its value to the owner. The value of an article may be shown by proof of such elements or facts as may exist—such as its cost, the cost of reproducing or replacing it, its utility and use. . . ." (*Universal Pictures Co.*, v. *Harold Lloyd Corp.*, 162 F.2d 354, 370, quoting from 15 Am.Jur. 554, 555.) It would appear that the evidence is sufficient to support the finding of the jury as to the amount of damages, and that the verdict was not given under the influence of passion and prejudice.

The newly discovered evidence claimed by defendant is shown by the affidavit of one James Allen who states that in 1935 he conceived the idea of a radio program on which would appear stories presented in dramatic form to the public as a "showcase" of possible literary material for the legitimate stage. This idea was registered with "Billboard," a theatrical publication in New York City in 1935. In 1939, this idea was registered with the Screen Writers' Guild under the possible title, "Play Preview." It contained no element of audience participation or offer of prizes. The idea back of his program was to present the stories to "the attention of stage and screen producers" and not to the public generally. Allen's 1939 prospectus did not set forth any of the details of his idea. Plaintiff was working for Allen as musical director at that time, and he states that he made several suggestions with respect to the program. This is denied by Allen in his

affidavit. There are affidavits in the record to the effect that plaintiff had discussed his program idea in 1938 with the affiants. These affidavits present the same conflict as the evidence adduced at the trial. They were before the court upon the motion for a new trial. A motion for a new trial on this ground is to a large extent addressed to the discretion of the trial judge, and an appellate court will not disturb his ruling unless it is manifest that a gross or unmistakable abuse of discretion appears. (*Kirschbaum* v. *McCarthy,* 5 Cal.2d 191 [54 P.2d 8]; *Cooper* v. *Kellogg,* 2 Cal.2d 504 [42 P.2d 59]; *Buckhantz* v. *R. G. Hamilton Co.,* 71 Cal.App.2d 777 [163 P.2d 756]; *Montaldo* v. *Hires Bottling Co.,* 59 Cal.App.2d 642 [139 P.2d 666]). It cannot be said that there was such an abuse of discretion in the present case.

The judgment is affirmed.

Gibson, C. J., Shenk, J., and Edmonds, J., concurred.

SCHAUER, J.—I concur in the judgment of affirmance.

The problem in this case is to me a closer one and more difficult of solution than that presented in *Golding* v. *R.K.O. Pictures, Inc., post,* p. 690 [221 P.2d 95]. In Golding there is no substantial similarity between the two works except possibly in the so-called "central core," which, in this decade, as I have shown (*post,* p. 710), is no more novel or original than (on a claim of like date) the Star Spangled Banner. But here there is cognizable similarity or deducible relationship between every substantial element of the program which defendant produced and that which was proposed by plaintiff. Likewise, the evidence shows ample opportunity for piracy. The sole controlling question then is one of fitness for literary protectibility of that which was pirated.

The problem here is more difficult than in Golding because here we are in a newer field; all of its vistas have been by no means explored. The merchandise offered for sale in this case—and assertedly appropriated—is of a quite different character from that involved in Golding. The craft of story-plotting, together with the art of story-telling, has come down through the centuries, and legislatures and courts long have experimented with affording a measure of monopolistic or property-right protectibility to literary compositions of conventional nature even though all plotted stories, it is said, must be but an application of one or more of "The Thirty-Six Dramatic Situations." (Georges Polti.) Although original

plots (dramatic situations) were exhausted centuries ago, original and novel ideas for handling old plots seem inexhaustible, and as long as sufficient originality in treatment or handling of the old plot appears the law endeavors to afford property protection.

In Golding, where the details and whole treatment of plaintiffs' play and defendant's picture are essentially different, and where the only possibly cognizable similarity is in the so-called "central core" or "basic plot," we can turn to a plot catalog and it becomes immediately obvious that no property right of plaintiffs has been appropriated in The Ghost Ship. But here, as above indicated, the problem and its solution are not so simple; the answer cannot as yet, I think, be found in a catalog nor even in the law books.

The plaintiff here did not write a story or a play. He does not claim originality in the handling of any dramatic plot. He does claim to have originated a plan for a radio program, and to have written and recorded the formal script for the proposed program. Such a plan, together with its script, if truly original, may constitute a protectible "product of the mind" (see Civ. Code, § 980). The plan, together with the script as formulated by plaintiff, has been set forth fully in the majority opinion and is largely again quoted in the dissenting opinion of Justice Traynor; it need not be repeated here. Suffice it to say that such plan proposed this version of the "theatre of the air" type of weekly program: Recognized plays—at least plays which had already been produced or scheduled for production in motion picture form—would not be used; instead, sketches or scenarios which the author was offering for motion picture use would be adapted for radio presentation; the special announcer or "producer" for the radio presentation would be a prominent picture figure; he would ask the radio audience to send in their opinions of the show with particular reference as to whether they would like a motion picture version and their ideas for casting the parts; a cash prize would be awarded each week to the author of the "best letter"; the program would be denominated "_____ [the producer] Presents" and, generically, it was referred to as a "Hollywood Preview" or "Preview Parade." Plaintiff does not claim to have himself authored any play offered for use on the proposed program.

Several years after the plaintiff's plan was submitted to defendant it (in 1945) produced a program entitled "Holly-

wood Preview." Like plaintiff's plan it embodied a theatre-of-the-air type presentation "of a motion picture of the future" with announcements pertaining to the production by an "eminent star of radio, stage and screen"; the studio audiences were requested to "fill out cards giving their comments" on the proposed picture production and "suggesting their favorite stars for the motion picture." Likewise, the defendant in connection with the program it produced, announced a six-weeks prize-contest for best letters relating to the program in which letters, it was suggested, the listeners should "express their opinion of the stories 'previewed'" and "vote for the stories they would like to see on the screen."

The pervasive over-all similarity between plaintiff's program-plan and that used by defendant is patent; the evidence establishes (under rules which historically have governed appellate courts) that plaintiff submitted his plan to defendant and that there was opportunity to appropriate it. The jury, under proper instructions, impliedly found that it was appropriated with an implied promise to pay its reasonable value. The basic question for us then, as I view it, is this: Is the plan as presented by plaintiff such an original product of the mind as to be legally the subject of private ownership? If it is, and if a protectible element of it has been appropriated by defendant, the verdict must stand; if not, the defendant is entitled to judgment.

A fair answer to such critical question requires this further factual analysis. No single basic element of plaintiff's program can be said to be novel or to have originated with him; all such elements had been used before. Plaintiff, however, did suggest what appears to have been a novel adaptation and application of the audience participation idea—its adaptation and application, theoretically, to aid producers in the selection of stories for picture production. The real object of the audience participation technique is, of course, an appeal to the interest of the listeners. This program, it would seem, was devised to appeal particularly to "movie fans," to win their radio program attention through catering to their motion picture interest. Upon the record it cannot be held that this particular application of the audience participation appeal, as it was dressed up and treated by plaintiff, was not originated by him nor that its admittedly somewhat varied and limited use in the program produced by defendant was so unsubstantial as to be legally negligible.

The learned and careful trial judge painstakingly explained

to the jury that "Any person is free to use matters in the public domain as sources of literary or dramatic property but no person . . . is free to use the composition of another if such composition involves a new arrangement, combination or treatment of matters in the public domain, although such matters by themselves might not be protectible." He further told the jury that "in order to return a verdict for plaintiff, the radio program idea which plaintiff expressed in writing and recorded, or some feature thereof, must have been new, novel and original. An abstract idea cannot be the subject matter of an implied agreement to purchase but if such abstract idea is reduced to concrete form, it may in such form be made the subject of such an agreement to the extent that the concrete form of such idea is new, novel and original." Lastly, in this connection, it is to be noted that the jury were told: "You should determine, *first* [italics added], whether plaintiff's idea could be the subject matter of such an agreement; secondly, whether the facts justify your finding that there was any such implied agreement; and, thirdly, whether defendant copied or appropriated from plaintiff any portion of plaintiff's idea which is found to be a proper subject matter of such an agreement"; and he cautioned the jury, "If you find similarities between plaintiff's program . . . and defendant's program . . . you must determine, first, whether any of such similarities are in ideas or features or combinations thereof which are new, novel or original, and, secondly, whether, if any such similarities exist such similarities were appropriated by defendant from plaintiff's program or, on the other hand, whether they were originated by employees of defendant or were secured from sources other than plaintiff's program. Unless you are convinced . . . that there are such similarities between the two programs and that such similarities are a result of defendant's use of plaintiff's program rather than origination and development by employees of defendant or from the use of other sources, your verdict must be for the defendant . . . Independent creation of identical ideas is not a basis for liability. In order that a verdict can be returned against defendant there must have been copying or appropriation from plaintiff."

It is difficult to conceive how the jury could have been more clearly or adequately instructed on the applicable law. The question as to whether, on the law as declared by the trial judge, the evidence admits of the findings made by the jury is admittedly a close one. But where, as here, there is an

element of originality in plaintiff's program and there is some similarity between every element of plaintiff's program and that which defendant produced, and where plaintiff's program was submitted to defendant and the jury has found, on the instructions quoted, that defendant copied and appropriated plaintiff's program, including an original element thereof, in the construction of the one it produced, and further found the implied promise to pay the value of that which it appropriated, it seems to me that we should breach a fundamental principle of trial by jury were we to hold that the evidence does not support the verdict. In other words, I think that the dissenting view in this case rests not on a pure question of law nor on a total lack of evidence but, necessarily, on an analysis of the evidence which argues its weight. I do not think that because the element of originality in the combination of free ideas is comparatively small, we can hold that as a matter of law the composition is wholly unprotectible.

Obedient, then, to the principle declared in such cases as *Cardillo* v. *Liberty Mutual Ins. Co.* (1947), 330 U.S. 469 [67 S.Ct. 801, 807, 91 L.Ed. 1028]; *Ellis* v. *Union Pacific Railroad Co.* (1947), 329 U.S. 649, 653 [67 S.Ct. 598, 600, 91 L.Ed. 572, 576]; *Eagles* v. *United States ex rel. Samuels* (1946), 329 U.S. 304, 317 [67 S.Ct. 313, 320, 91 L.Ed. 308, 317]; *Estate of Bristol* (1943), 23 Cal.2d 221, 223 [143 P.2d 689]; *Cate* v. *Certain-teed Prod. Co.* (1943), 23 Cal.2d 444, 448 [144 P.2d 335]; *Estate of Teel* (1944), 25 Cal.2d 520, 526 [154 P.2d 384]; *Fackrell* v. *City of San Diego* (1945), 26 Cal.2d 196, 207 [157 P.2d 625, 158 A.L.R. 625]; *Viner* v. *Untrecht* (1945), 26 Cal.2d 261, 267 [158 P.2d 3]; *Pewitt* v. *Riley* (1945), 27 Cal.2d 310, 316 [163 P.2d 873]; *De Young* v. *De Young* (1946), 27 Cal.2d 521, 526 [165 P.2d 457]; *Millsap* v. *National Funding Corp.* (1944), 66 Cal.App.2d 658, 665 [152 P.2d 634]; *Southern Calif. Freight Lines* v. *State Bd. of Equalization* (1945), 72 Cal.App.2d 26, 29 [163 P.2d 776]; *Berry* v. *Chaplin* (1946), 74 Cal.App.2d 652, 663 [169 P.2d 442]; *Medina* v. *Van Camp Sea Food Co.* (1946), 75 Cal.App.2d 551, 556 [171 P.2d 445]; *Seidenberg* v. *George* (1946), 76 Cal.App.2d 306, 308 [172 P.2d 891], the verdict should be sustained.

For the reasons above stated I concur in the judgment of affirmance.

TRAYNOR, J, Dissenting.—Abstract ideas are common property freely available to all. What men forge out of these

ideas with skill, industry, and imagination, into concrete forms uniquely their own, the law protects as private property. It gives the special form the stamp of recognition; it does so to stimulate creative activity. It does something more to stimulate creative activity: it assures all men free utilization of abstract ideas in the process of crystallizing them in fresh forms. For creativeness thrives on freedom; men find new implications in old ideas when they range with open minds through open fields. They would indeed be stifled in their efforts to create forms worth protecting, if in the common through which they ranged they were diverted from their course by one enclosure after another. "We must take care to guard against two extremes equally prejudicial: The one that men of ability, who have employed their time for the service of the community, may not be deprived of their just merits and the reward of their ingenuity and labor; the other, that the world may not be deprived of improvements, nor the progress of the arts be retarded. The act that secures copyrights to authors guards against the piracy of the words and sentiments, but does not prohibit writing on the same subject." (Lord Mansfield, in *Sayre* v. *Moore,* 1 East 361, 101 Eng.Rep. 140.)

It would be ironic if copyright law, designed to encourage creative activity, became the instrument of its destruction. The very function of creative activity is to keep the common field in continuous germination; it is not for copyright law to render it barren by a succession of enclosures denying access to those who would cultivate it. "The object of copyright is to promote science and the useful arts. If an author, by originating a new arrangement and form of expression of certain ideas or conceptions, could withdraw these ideas or conceptions from the stock of materials to be used by other authors, each copyright would narrow the field of thought open for development and exploitation, and science, poetry, narrative, and dramatic fiction and other branches of literature would be hindered by copyright, instead of being promoted. A poem consists of words, expressing conceptions of words or lines of thoughts; but copyright in the poem gives no monopoly in the separate words, or in the ideas, conception, or facts expressed or described by the words. A copyright extends only to the arrangement of the words. A copyright does not give a monopoly in any incident in a play. Other authors have a right to

exploit the facts, experiences, field of thought, and general ideas, provided they do not substantially copy a concrete form, in which the circumstances and ideas have been developed, arranged and put into shape." (*Eichel* v. *Marcin*, 241 F. 404, 408-409; *Nichols* v. *Universal Pictures Corp.*, 45 F.2d 119, 121; *Holmes* v. *Hurst*, 174 U.S. 82 [19 S.Ct. 606, 43 L.Ed. 904].) To insure free trade in ideas, therefore, the monopoly created by copyright is limited to "the arrangement and combination of the ideas . . . the form, sequence and manner in which the combination expresses the ideas." (*Bowen* v. *Yankee Network, Inc.*, 46 F.Supp. 62, 64.)

The policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract. Even though an idea is not property subject to exclusive ownership, its disclosure may be of substantial benefit to the person to whom it is disclosed. That disclosure may therefore be consideration for a promise to pay. (*Bristol* v. *Equitable Life Assur. Soc.*, 132 N.Y. 264, 267 [30 N.E. 506, 28 Am.St.Rep. 568] ; *Moore* v. *Ford Motor Co.*, 43 F.2d 685, 686.) Unlike a copyright, a contract creates no monopoly; it is effective only between the contracting parties; it does not withdraw the idea from general circulation. Any person not a party to the contract is free to use the idea without restriction.

Even though the idea disclosed may be "widely known and generally understood" (*Schonwald* v. *F. Burkart Mfg. Co.*, 356 Mo. 435 [202 S.W. 2d 7, 13], it may be protected by an express contract providing that it will be paid for regardless of its lack of novelty. (*Brunner* v. *Stix, Baer & Fuller Co.*, 352 Mo. 1225, 1237 [181 S.W.2d 643] ; *High* v. *Trade Union Courier Pub. Corp.*, 69 N.Y.S. 2d 526, 529.) An implied-in-fact contract differs from an express contract only in that the promise is not expressed in language but implied from the promisor's conduct. (*Yadkoe* v. *Fields*, 66 Cal.App.2d 150, 158 [151 P.2d 906] ; *Ryan & Associates, Inc.* v. *Century Brewing Assn.*, 185 Wash. 600, 603 [55 P.2d 1053, 104 A.L.R. 1353] ; *Cole* v. *Phillips H. Lord, Inc.*, 262 App.Div. 116 [28 N.Y.S.2d 404, 409].) It is not a reasonable assumption, however, in the absence of an express promise, or unequivocal conduct from which one can be implied, that one would obligate himself to pay for an idea that he would otherwise be free to use. Even an express contract to pay for "valuable information" to be submitted by the plaintiff does not carry the implication of a promise to pay if it is found upon disclosure to be common

knowledge. (*Masline* v. *New York, New Haven & Hartford R. Co.*, 95 Conn. 702, 708 [112 A. 639].) If the idea is not novel, the evidence must establish that the promisor agreed expressly or impliedly to pay for the idea whether or not it was novel. (*Masline* v. *New York, New Haven & Hartford R. Co., supra*; *Soule* v. *Bon Ami Co.*, 235 N.Y. 609 [139 N.E. 754].)

The gravamen of plaintiff's cause of action is not the unauthorized use of his idea, since ideas may be freely borrowed, but the breach of an agreement to pay for its use. If the evidence discloses that there is no express or implied-in-fact contract there can be no recovery. (*Bristol* v. *Equitable Life Assur. Soc.*, 132 N.Y. 264, 267 [30 N.E. 506, 28 Am.St.Rep. 568]; *Alberts* v. *Remington Rand, Inc.*, 175 Misc. 486 [23 N.Y.S.2d 892, 894]; *Bowen* v. *Yankee Network, Inc.*, 46 F. Supp. 62, 63-64.) It is urged that even in the absence of express or implied contract, recovery may be predicated upon a quasi contract, or implied-in-law promise to pay the reasonable value of the idea if it is used. Quasi-contractual liability, however, is based, not upon any evidence of consensual agreement but in the absence of such agreement, upon the theory that the defendant would be unjustly enriched if he were allowed to use the idea without paying for it. A defendant who makes use of an abstract idea that is common property is not unjustly enriched thereby, since he has taken nothing to which the plaintiff or any other person has the right of exclusive ownership. Given the principle that abstract ideas are free, there is no more right to recovery for their use in an action in quasi contract than in an action for infringement of copyright. It has been consistently held that an action in quasi contract for the use of an idea is governed by the same principles that control a tort action for copyright infringement: the idea must be embodied in a concrete form attributable to plaintiff's own ingenuity (*Bailey* v. *Haberle Congress Brewing Co.*, 193 Misc. 723 [85 N.Y.S.2d 51, 52]; *Bowen* v. *Yankee Network, Inc.*, 46 F.Supp. 62, 63; *Thomas* v. *R. J. Reynolds Tobacco Co.*, 350 Pa. 262, 267 [38 A.2d 61, 157 A.L.R. 1432]; *Moore* v. *Ford Motor Co.*, 28 F.2d 529, 539, aff'd. 43 F.2d 685, 688), and the form as distinguished from the abstract idea must be used by the defendant. (*Matarese* v. *Moore-McCormack Lines, Inc.*, 158 F.2d 631, 634; *Plus Promotions, Inc.*, v. *R.C.A. Mfg. Co.*, 49 F.Supp. 116, 117; *Booth* v. *Stutz Motor Car Co.*, 56 F.2d 962, 969.) In either

case the plaintiff must prove that property was taken that was his. His choice of alternative actions is analogous to that of a plaintiff whose personal property has been converted and who may elect between a tort action for the value of the converted property and an action based upon an implied-in-law contract to pay the reasonable value of its use. The plaintiff's election will govern the nature of his recovery, but it does not affect the basic elements of his cause of action. (*Bank of America* v. *Hill,* 9 Cal.2d 495, 498-499 [71 P.2d 258] ; *Los Angeles Drug Co.,* v. *Superior Court,* 8 Cal.2d 71, 74 [63 P.2d 1124] ; *Hallidie* v. *Enginger,* 175 Cal. 505, 508 [166 P. 1] ; *Corey* v. *Struve,* 170 Cal. 170, 172 [149 P. 48] ; *Bechtel* v. *Chase,* 156 Cal. 707, 711 [106 P. 81].)

Plaintiff developed a script and format embodying his idea for a radio program based upon the production of radio plays in a Hollywood setting. Had defendant appropriated the concrete form in which the idea was expressed, the ''literary or artistic creation available for advertising use or otherwise'' (*Williamson* v. *New York Cent. R. Co.,* 258 App. Div. 226 [16 N.Y.S.2d 217]), plaintiff would have a cause of action for infringement of his common law copyright in the development of the idea that he had conceived. (Civ. Code, § 980 ; *Barsha* v. *Metro-Goldwyn-Mayer Pictures Corp.,* 32 Cal.App.2d 556, 561 [90 P.2d 371] ; *Sheldon* v. *Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 54.) Plaintiff concedes, however, that there could be no recovery if this action were one in tort for copyright infringement and that he was properly nonsuited as to his cause of action based thereon, presumably because there was no appropriation of whatever craftsmanship gave concrete form to his program idea. For the same reason there could be no recovery in quasi contract. Plaintiff can only recover upon an implied-in-fact agreement that defendant would pay him the reasonable value of his idea.

Plaintiff's second cause of action, upon which the judgment in his favor rests, was based upon the allegation that he submitted his program idea to defendant's agents ''at said defendant's special instance and request . . . under and pursuant to an implied agreement that if said defendant used plaintiff's said radio program or any part or portion thereof, that said defendant would pay to plaintiff the reasonable value thereof.'' There is substantial evidence to support the allegation that defendant accepted plaintiff's submission of his program idea with knowledge that he expected to be compensated for its use under an implied agreement that he would be

paid for the idea if it proved to be commercially valuable and was in fact used by the defendant.[1]   The evidence does not, however, furnish support for an inference that defendant agreed to pay for the use of the idea even though it might prove to be "common or even open to public knowledge." (*High* v. *Trade Union Courier Pub. Corp.*, 69 N.Y.S.2d 526, 529.)

Such a promise cannot reasonably be implied from the practice of the radio industry.[2]   Admittedly, the industry is

[1]Plaintiff testified to his conversation with Russ Johnson, then program director of KNX, defendant's station for the Los Angeles area:

"I think I called him on the telephone for an appointment and told him I had a recording, and a format and a script on what I thought was a new and a good radio idea, and he asked me to bring it to his office. I brought it to his office, and when I got it there he told me he was very busy at the time and would I please leave the recording, and the script and the format with him for about a week or 10 days, or at the outside two weeks, and that he would listen to me in the interim and give me his opinion as to what he thought of it, and if the Columbia Broadcasting System or its sales department could sell it."

Hal Hudson, defendant's western program director, also testified to his conversation with Ben Paley, defendant's program operations manager:

"Q. Did Mr. Paley ever mention to you the fact that Stanley had a program?

"A. Yes. At some later date I believe he told me that Mr. Stanley had a program entitled Walter Wanger Presents.

"Q. Well, can you fix the date of that statement that Mr. Paley made to you?

"A. Only that it undoubtedly was after May 15, 1943 because before that time I had no responsibilities toward new programs. My duties were concerned with programs on the air.

"Q. What did Mr. Paley tell you about this program Walter Wanger Presents?

"A. He told me only that Stanley, whom I had previously met, had such a program.

"Q. Did he tell you what it was about?

"A. No, he didn't.

"Q. What was the occasion of his mentioning it to you?   What did he say?

"A. I think he said in effect, 'Stanley has a program Walter Wanger Presents which I would like to have you hear.'

"Q. Did he tell you it concerned the broadcast of stories written for motion pictures?

"A. No. He told me nothing about it. He said, 'I think it is a pretty good program.' "

[2]The testimony of Hudson, upon which plaintiff relies, demonstrates the willingness of the industry to pay for ideas of commercial value but furnishes no support for any inference that it would agree to pay for common and hackneyed ideas:

"Q. Now, Mr. Hudson, is there any recognized right in the radio field to an original program idea?

"A. It seems to me that is a point of law which I am not qualified to answer.

"Q. You are not familiar with the practices of the industry so far

willing to pay for new ideas of commercial value to it, but there is no basis for an inference that a national radio network would agree to pay for the use of an idea, regardless of whether it is novel or shopworn, hackneyed, and commonplace. "A duty not to use an idea already known cannot be created by virtue of the fact that one makes a confidential disclosure of that idea." (*Smoley* v. *New Jersey Zinc Co.*, 24 F.Supp. 294, 300, aff'd. 106 F.2d 314.) Plaintiff's recognition that novelty is essential to the marketability of a radio program idea is implicit in his statement to Johnson that he had "what I thought was a new and a good radio idea." Defendant's policy is set forth in a standard form, of which plaintiff was aware, that all persons who submit program ideas for consideration were requested to sign.[3] In that form, Columbia unequivocally disclaimed any intention to pay for the use of a non-novel idea. Its willingness to consider plaintiff's program idea was in accord with that policy. The evidence does not indicate any intention on defendant's part to deviate therefrom. It must therefore be held that plaintiff submitted his program idea to defendant upon the latter's implied-in-fact promise to pay him the reasonable value of the idea if it should prove to be novel and commercially valuable and if defendant should put it to use.

---

as the recognition of program ideas are concerned, or payment therefor?

"A. I am familiar with the practice, yes.

"Q. Now, is there such a thing as recognition in the radio industry of a radio program idea?

"A. Yes.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. By Mr. Fendler: Is there any practice in the radio industry on the part of broadcasting companies to pay for the reasonable value of radio program ideas apart from services?

"A. Ideas which they have contracted for?

"Q. Which they have contracted for or used.

"A. Which they have contracted for, yes.

"Q. As a matter of fact, the broadcasting companies request the submission of program ideas, do they not?

"A. I wouldn't say they solicit them. They accept them.

"Q. And they accept them upon the basis that if they are used, they will be paid for?

"A. Yes.

"Q. Is that right?

"A. Yes.

"Q. And that is well understood in the industry, isn't that correct?

"A. Yes."

[3]"To Columbia Broadcasting System, Inc.

"I am submitting my idea, summarized or characterized below, about a radio program to you today with the understanding that you are wholly free to determine questions of priority and originality in connection with any identical or substantially similar ideas . . ."

This appeal thus presents two questions for the decision of this court:

(1) Is plaintiff's radio program or any part thereof novel and commercially valuable?

(2) Is there similarity between plaintiff's idea and defendant's radio program with respect to any novel aspects of the former to support an inference that defendant made unauthorized use of plaintiff's idea?

I

Plaintiff testified that the basic idea of his program, for the use of which he claimed a reimbursement of $100,000, was to give the people of America "a voice in what pictures Hollywood shall produce in the years to come." His idea took the form of a proposed weekly radio program entitled "Walter Wanger Presents," "Preview Parade," or "Hollywood Preview," which was to present a play that might be suitable for motion picture production. The listening public was to be encouraged to write letters, by an offer of prizes for the best, commenting upon the motion picture value of the plays and suggesting stars for the leading roles; it was thus to have a voice in selecting stories and stars for motion pictures.

Virtually none of the elements of the proposed program to give the public a voice in this selection is novel. There is nothing novel in the idea of linking dramatized stories on the radio with the glamour of Hollywood. The following programs, broadcast nationally, were also based upon this idea: "Lux Theater of the Air," "Hollywood Star Time," "Screen Guild Theater," "Hollywood Premiere," "Hollywood Playtime," "Hollywood Players," "This is Hollywood."

There is nothing novel about plaintiff's title "Hollywood Preview." There was uncontradicted testimony that during the period defendant's program was broadcast, another program with the same title was broadcast locally over other stations. Moreover, these words have long been associated with the previews of Hollywood motion pictures, notably at Grauman's Chinese Theater and at the Carthay Circle Theater. To the millions of movie-conscious persons at whom all these programs are aimed, the title has become generic and descriptive, symbolizing the glamour associated with Hollywood, the bright lights, the milling throngs waiting for a glimpse of the celebrities attending a first showing of a motion picture. "There can be no property in words which are merely generic or descriptive." (*Johnston* v. *Twentieth Century-Fox Film*

*Corp.*, 82 Cal.App.2d 796, 808 [187 P.2d 474].) That this title is generic or descriptive is clearly indicated by plaintiff's use of it in the script of his proposed program, not as its title (the proposed title was "Walter Wanger Presents"), but as a descriptive term, indicating the first performance of a proposed motion picture. In giving their program this title, defendants appropriated nothing in which plaintiff could claim a property interest.

There is nothing novel in the idea of listener participation in a radio program. Radio has long been glutted with programs in which listeners are importuned to participate. Thus listeners on the Jack Benny program were importuned to submit letters on the topic "I hate Jack Benny because——." Listeners on the program entitled "The Shadow" were importuned to relate in a hundred words or less why they use Camay Soap. Listeners on the program entitled "Listeners' Digest" were importuned to write on what they considered the outstanding radio entertainment they had heard in the preceding week.

There is nothing novel in the idea of giving prizes to radio listeners for best letters. The idea of giving prizes for best letters is an ancient one in advertising.

There is nothing novel in the idea of soliciting the comments of listeners as to whether a radio program merits commercial presentation. Thus the Major Bowes program solicited the comment of listeners on the amateurs on the program with the object of determining whether they should receive professional engagements.

There is nothing novel about the following elements or their combination with the foregoing features of plaintiff's program: repetition and emphasis of the title throughout the broadcast, introduction of the master of ceremonies by the announcer, a master of ceremonies prominent in the motion picture industry, announcement of the title of the play to be presented and the stars therein, and announcement of the author of the play. These elements have for years been a part of almost every program featuring radio stories with a Hollywood connection. Defendant, as well as plaintiff, may use these elements freely either singly or in combination. (See, *Ornstein* v. *Paramount Productions, Inc.*, 9 F.Supp. 896, 901.)

It may be possible to combine such hackneyed elements so imaginatively that they comprise a novel program idea, or to give them a new twist that places them in the category of fresh material. A new twist to a worn idea may be as much

entitled to credit as an entirely new idea. "No man writes exclusively from his own thoughts, unaided and uninstructed by the thoughts of others. The thoughts of every man are, more or less, a combination of what other men have thought and expressed. . . ." (*Emerson* v. *Davies*, Fed.Cas. 4, 436, 8 Fed.Cas. 615, 618.) "Presenting old material in a new plan or arrangement is sufficient to lend copyrightability to the resulting work." (Amdur, Copyright Law and Practice, 86; *Universal Pictures Co.* v. *Harold Lloyd Corp.*, 162 F.2d 354, 363; *Edwards & Deutsch Lithographing Co.* v. *Boorman*, 15 F.2d 35, 36.) Two architects may originate very different designs for the same structure, specifying the use of identical materials; each has a property interest in his design. Similarly writers may create original stories out of the same problem, as Anatole France created "Thais," Somerset Maugham, "Miss Thompson" ("Rain"), and Andre Gide, "Symphonie Pastorale." And in the literature of music there are many creative variations by one great composer on the themes of another.

Plaintiff has made no unique combination or interpretation of old material. Whatever novelty there may be in his program lies in a fresh variation of the listener participation idea, a variation of the idea in the Major Bowes program of having the listeners participate in determining whether amateur artists should become professionals. Although the evidence demonstrates that previous to the presentation of plaintiff's program to defendant there was no radio program in which the listeners participated in determining the selection of stories and stars for motion pictures, there is a question whether plaintiff has conceived a variation of the listener participation idea substantial enough to warrant a claim to novelty. Novelty of ideas in radio programs must be assessed in the light of the fact that many programs are commonplace presentations of commonplace materials. Inevitably ideas in this field may have a claim to novelty by virtue of their attention-getting possibilities, even though they lack the brilliance commonly associated with creative thought. A fresh application of the familiar, however dull or commonplace it may appear to the critical, may be a marketable idea if it gives enough promise of winning the attention of the public. It is not for the court to consider the quality of an idea or to pass judgment on the public's taste; the problem before it is not one of aesthetics but of property rights. (*Bleistein* v.

*Donaldson Lithographing Co.*, 188 U.S. 239, 251-252 [23 S.Ct. 298, 47 L.Ed. 460].) On the other hand, in the fertile field of commonplaceness there is also a propagation of ideas whose claims to novelty are spurious, for whatever value they may have rests not on their uniqueness but on their resemblance to the familiar. The value of a fresh application of an idea that has thrived on repetition may lie, not in the application, but in the familiar idea itself. The secret of success of such programs as plaintiff's seems to be listener participation, and since listener participation has already been used for such a variety of purposes, it is open to question whether its application to plaintiff's purpose is imaginative enough to compel one to say that something new has been added, that there has been a variation of the old that in some measure transforms it. (See, *Hirsch* v. *Paramount Pictures*, 17 F.Supp. 816, 818.)

## II

Whatever the validity of plaintiff's claim to novelty for his application of the listener participation idea, it constitutes his only claim to novelty, and defendant is not liable if it did not use that application.

There can be no finding that defendant used plaintiff's program idea without proof that it had access thereto. (*Twentieth Century-Fox Film Corp.* v. *Dieckhaus*, 153 F.2d 893, 894, cert.den. 329 U.S. 716 [67 S.Ct. 46, 91 L.Ed. 621] ; *Lewys* v. *O'Neill*, 49 F.2d 603, 608, 610.) Access is established by proof that employees of defendant read or heard plaintiff's program before or in the course of the development of defendant's program. (*Kustoff* v. *Chaplin*, 120 F.2d 551, 560.) It is undisputed that before defendant's program was broadcast, the employees of defendant had read and considered the script, recording, and format submitted to them by plaintiff. There was a conflict in the evidence as to whether Hudson, defendant's western program director, developed defendant's program before plaintiff submitted his idea. The jury resolved that conflict against the defendant. Proof of opportunity to use plaintiff's idea, however, does not compel affirmance of the judgment without proof that defendant availed itself of that opportunity. (*Kustoff* v. *Chaplin*, *supra*; *Cain* v. *Universal Pictures Corp.*, 47 F.Supp. 1013, 1015.) Direct proof of use is seldom available. If there is proof of access, however, copying may be inferred from similarity between the two programs with respect to the feature of plaintiff's idea, which it will be assumed for the purpose of this

dissent was novel, the application of listener participation to the determination of a story's suitability for motion pictures.

It must therefore be determined whether there is such a similarity between the two programs. Mere general similarity that proceeds not from the novelty of plaintiff's idea but from its commonplaceness is irrelevant. Only similarity with respect to what is novel in plaintiff's idea is relevant. (*Booth* v. *Stutz Motor Car Co.*, 56 F.2d 962, 969; *Saco-Lowell Shops* v. *Reynolds*, 141 F.2d 587, 593; *Plus Promotions, Inc.* v. *R.C.A. Mfg. Co.*, 49 F.Supp. 116, 117.) The standards that govern this inquiry are the same as those governing the question whether there is relevant similarity between two productions to support a finding of copying in a suit for copyright infringement. When a plaintiff claims the protection of common law or statutory copyright for his literary effort, that protection extends only to any originality of treatment or expression that is copyrightable. When a plaintiff claims the protection of an implied-in-fact contract for an abstract idea, his idea must have the characteristic of novelty for which defendant has promised to pay. In both cases, only similarity appearing between the two works with respect to that which is protected in plaintiff's work is relevant. General similarity in nonprotectible elements, being irrelevant, cannot support an inference of copying in a piracy suit or use in a suit upon a contract. (*Harold Lloyd Corp.* v. *Witwer*, 65 F.2d 1, 17; *MacDonald* v. *Du Maurier*, 75 F.Supp. 655, 662; *Shipman* v. *R.K.O. Radio Pictures Corp.*, 100 F.2d 533, 537; *Rosen* v. *Loew's, Inc.*, 162 F.2d 785, 788.)

The majority opinion holds that the jury's finding will be upheld on appeal if "such similarity exists between plaintiff's and defendant's programs as to suggest to the average person the use by defendant of an idea originating with plaintiff. . . . In determining whether the similarity which exists between a copyrighted literary, dramatic or musical work and an alleged infringing publication is due to copying, the common knowledge of the average reader, observer, spectator or listener is the standard of judgment which must be used. . . . The evidence, in the form of the two programs alone, shows that there is substantial similarity to support the verdict." This statement assumes that a general similarity between the two programs justifies submitting to the jury the issue of use. Recovery can be allowed, however, only if there is similarity

684

between the programs with respect to the novel aspects of plaintiff's program.

The majority opinion holds that plaintiff has met this requirement by introducing evidence that his program contains a novel idea. Once he has done this, the mere fact of introduction of the two programs into evidence is enough to allow the case to go to the jury and to support a verdict reached thereon. The jury compares the programs as an average listener would. If it receives the impression from its common knowledge that there is similarity between the two programs, this impression and common knowledge support the inference that defendant used plaintiff's program idea, and defendant is liable for the reasonable value thereof. The jury may determine that defendant must pay therefor, even though it is evident that plaintiff's protectible property interest in his program comprises only a small part thereof, and even though it is evident from a comparison of the two programs that there is no similarity between them in regard to the novel idea of plaintiff's program. Such a procedure may have the prejudicial effect of supporting a charge of piracy even though substantial similarity between two programs results from the use in both of stock situations or standardized techniques long used in the radio industry and therefore in the public domain. (See, *Harold Lloyd Corp.* v. *Witwer*, 65 F.2d 1, 17, *Moore* v. *Ford Motor Co.*, 28 F.2d 529, 536; *Echevarria* v. *Warner Bros. Pictures*, 12 F.Supp. 632, 635; 18 C.J.S. 231.) It is therefore of the greatest importance to narrow the issue of similarity. If the jury is permitted to reach its verdict on the basis of a general comparison of the programs in their entirety, there is great risk that similarity between the programs in their commonplace aspects will be weighed to defendant's disadvantage and that plaintiff will be permitted reimbursement for the non-novel elements of his program idea, for which defendant did not agree to pay. If a general similarity may of itself support a verdict in plaintiff's favor an appellate court would be powerless to afford relief from such a verdict, even though the only similarity is between the non-novel elements contained in both programs.

The error inherent in the scope of inquiry prescribed by the majority opinion is not obviated by its concession that, once the jury has returned a verdict for plaintiff that may have been based on irrelevant general similarity, "we look to the evidence to ascertain whether such similarity existed as to the portion of the production which plaintiff claims to have

originated.'' We thus have the anomalous situation in which a case must first be submitted to the jury and a verdict returned for the plaintiff before the court can determine whether the case should have been submitted to the jury.

Such a result is not supported by the weight of case authority. In *Harold Lloyd Corp.* v. *Witwer*, 65 F. 2d 1, plaintiff sought to enjoin the exhibition of a motion picture by the defendant on the ground that it constituted an infringement of a magazine story previously published by the plaintiff. Admittedly there was substantial similarity in plot and in several isolated comedy sequences, and on this basis, the trial court gave judgment for the plaintiff. The Circuit Court of Appeals for the Ninth Circuit, however, reversed the judgment, stating that an examination of the two scripts revealed no similarity in those elements of plaintiff's production that were the product of his own ingenuity and creative talent. In discussing the fact that plaintiff relied upon admitted similarities in basic elements of each production, the court stated:

''In the case at bar, if it be assumed that there are such similarities between the story and the play as to provoke in the casual observer the consciousness that there is such a similarity between them, and that copying may be inferred therefrom, we are still confronted with the fact that mere similarity does not necessarily involve literary piracy or an infringement of a copyright. Such similarities then as exist would require further analysis to determine whether or not they are novel in the story and thus copyrightable. The copyright of a story only covers what is new and novel in it, so that the question of infringement involves a consideration of what is new and novel in the story to which the author has acquired a monopoly which has been misappropriated by another . . . 'It should also be borne steadfastly in mind, that if a work is not entirely original, there is no copyright in the unoriginal part, which will prevent its use, separately, or in combination, with matter not covered by copyright. Hence, of course, any inquiry as to infringement must exclude *permissible reproduction* of such *non-original matter.*' '' (65 F.2d 23-24.)

In *Dymow* v. *Bolton*, 11 F.2d 690, the Circuit Court of Appeals for the Second Circuit also reversed a trial court verdict for the plaintiff that had been reached upon admitted similarity in non-original elements of the two productions. In

stating that infringement could not be established by cutting and trimming down to basic themes and concepts, the court stated: "This incomplete skeleton the two plays have in common, but it is with real difficulty that the flesh and blood, the incidental, yet essential adornment and trimming, of the plays can be cut away to show similarity between a few bones. This difficulty is fatal to plaintiff's case . . . the copying which is infringement must be something . . . recognized as having been taken from the work of another." (11 F.2d 692. See also *Twentieth Century-Fox Film Corp.* v. *Dieckhaus,* 153 F.2d 893; *Nichols* v. *Universal Pictures Corp.,* 45 F.2d 119; *Frankel* v. *Irwin,* 34 F.2d 142; *Cain* v. *Universal Pictures Corp.,* 47 F. Supp. 1013.)

It follows that the issue before this court is not, as the majority opinion holds, whether there is substantial similarity between the two programs, but whether there is evidence of substantial similarity between the two programs with respect to plaintiff's novel idea to justify submitting the case to the jury. That issue can be determined only by the comparison of the two radio scripts whose contents are not disputed. Such a comparison will reveal whether there is relevant similarity between them. Defendant's motion for a directed verdict raised the issue whether there was such similarity. If there was no evidence of such similarity, then no proper inference of copying could be drawn, and the trial court should not have let the case go to the jury on the basis of the general similarity between the two programs. In denying the motion for a directed verdict, the trial court committed reversible error. (*Hewitt* v. *Coward,* 180 Misc. 1065 [41 N.Y.S.2d 498, 500]; *Soy Food Mills, Inc.* v. *Pillsbury Mills, Inc.,* 161 F.2d 22, 25; *Nichols* v. *Universal Pictures Corp.,* 45 F.2d 119, 122; *Wiren* v. *Shubert Theatre Corp.,* 5 F.Supp. 358, 362; *Becker* v. *Loew's, Inc.,* 133 F.2d 889, 894; *Dorsey* v. *Old Surety Life Ins. Co.,* 98 F.2d 872, 874 [119 A.L.R. 1250]; *Barbadillo* v. *Goldwyn,* 42 F.2d 881, 885; *Eastern Wine Corp.* v. *Winslow-Warren, Ltd.,* 137 F.2d 955, 960; *California Fruit Growers Exch.* v. *Sunkist Baking Co.,* 166 F.2d 971, 973; *Kaeser & Blair, Inc.* v. *Merchants' Assn., Inc.,* 64 F.2d 575, 576; see Code Civ. Proc., § 426, subd. 3.)

The cases relied upon by the majority indicate that only when there is evidence of relevant similarity to support an inference of copying is the question of copying submitted to the jury. (*Universal Pictures Corp.* v. *Harold Lloyd Corp.,* 162 F.2d 354, 363; *Fendler* v. *Morosco,* 253 N.Y. 281, 287 [171

N.E. 56]; *Barsha* v. *Metro-Goldwyn-Mayer Pictures Corp.*, 32 Cal.App.2d 556, 561 [90 P.2d 371].) In reversing the judgment, this court would not be substituting its judgment for that of the jury, as the majority opinion suggests, but would be determining that there was insufficient evidence to support the implied finding that there was similarity between the two programs with respect to plaintiff's novel idea.

Plaintiff's program was based on the idea, in his own words "the most important idea in my show," that it would afford the public a "voice in what pictures Hollywood shall produce in the years to come." This idea is emphasized in virtually every paragraph of the program: "Wanger: How do you do, ladies and gentlemen. Welcome to our Hollywood Preview Parade, a radio show designed for your pleasure *and to give you a vioce in what pictures Hollywood shall produce in the months to come.* Hollywood is very interested in giving you motion pictures you want to see. *Unfortunately producers do not and cannot always know just what you do want. This is the reason for this 'Preview Parade.'* Each week we plan to present a radio story we think will make a good film. We ask you to send us your opinion and suggest players for the leading roles. Our sponsor will give worthwhile cash prizes for the best letters, but more about that later.

"Of the five stories we have so far presented this series, three will be made into motion pictures *largly because of your voting. . . .*

"Boardman: . . . *Each week Mr. Wanger selects a story which he feels should be made into a picture.* You are asked to write to Mr. Wanger and give him your opinion. *The sponsors pay $500 for the best letter written by one of our listeners and if enough of you vote for it our play will be produced as a motion picture.*

"Wanger: . . . 'So Gallantly Gleaming' tells a thrilling and romantic story. . . . Listen closely. *Do you think it should be made into a motion picture? Your votes will decide.*

"Boardman: . . . *Now again a word as to the real idea behind this program. Each week Walter Wanger Presents brings you a story which we think would be a good motion picture. And here is your part in the program. We ask you to write to Mr. Wanger, telling him whether or not you would like to have this play made into a motion picture, and why. Also include your choice of stars to play the leading roles. The*

*best letter received each week will receive an award of $500 from our sponsor. . . . And believe me, Hollywood is waiting for your vote.* Whether or not you win a prize, *your vote will help decide whether or not to film 'So Gallantly Gleaming.'* The American picture-going public has long said it wished a voice in the choice of stories presented on the screen. Here is the chance for you to have that voice and make it heard across the nation. . . .

"Last week Mr. Wanger presented 'Out of the Night.' . . . A storm of argument was aroused. 68,000 letters have been received to date, and we are happy to announce that Warner Brothers Studio have arranged to make this startling story into a film in the near future. *So, thanks to your letters, you have helped Warner Brothers to their decision to film 'Out of the Night.'* . . .

"Wanger: . . . Thank you, [board of experts] . . . Do you, ladies and gentlemen, agree with the opinions of our guests? *Do you agree that 'So Gallantly Gleaming' should become a motion picture?* And who do you think should play the leading roles? Won't you write and tell us. *Remember that whether your letter is best and wins the prize or not, you are helping Hollywood decide on what to give you on the screen. . . .*" (Italics added.)

It is apparent from defendant's programs that their basic idea was to simulate the "first showing of a new motion picture in the film capitol" and thereby to capture in its "radio version of [a] Hollywood Preview," the "same spirit of enthusiasm," to make its listeners feel they were viewing that glamorous event. The programs were described as a "Hollywood Preview of a motion picture of the future," as a preview of a "new story written especially for the screen," and "now scheduled for production" or "now in preparation" at one of the motion picture studios. The public was to be given "a glimpse into the movies of tomorrow" but nobody at any time was asked to influence their selection. The *studio* audience was requested to "[fill] out cards giving their comments" on the play and "suggesting their favorite stars for the motion picture" for the purpose of giving a Hollywood atmosphere by adapting to a broadcast of motion pictures "previewed" on the air, the custom of having the motion picture audience fill out preview cards. There was no intimation that the reaction of the studio audience would in any way influence the production of the picture. In contrast the radio audience comments solicited in plaintiff's program

were not for the purpose of atmosphere; they were indispensable to his idea of giving the public a voice in the selection of motion pictures to be filmed. On August 21, 1945, defendant announced that a contest awarding prizes for best letters would be staged for a six-weeks period; that listeners would thus be given "a chance to express their opinion of the stories they would like to see on the screen." Defendant's contest was the time-honored advertising scheme used to increase sales of the sponsor's gasoline. To participate, listeners had to get entry blanks from the sponsor's service stations. The contest, lasting only six weeks, was an incident of the program, not its core. Defendant's program did not, in its contest feature, or otherwise, give the listening public the impression that "if enough of [the listeners] vote for it [the] play would be produced as a motion picture." It was specifically announced on defendant's programs that a "motion picture of the future" was being presented: on three programs it was stated that the plays were in production.

A comparison of defendant's program with the application in plaintiff's program of the listener participation idea, makes it clear that defendant did not in any of its programs copy that idea. There is a fundamental difference between the themes of the two programs. The basic idea of plaintiff's program was listener participation in the selection of stories and stars for motion picture production in the future. The basic idea of defendant's programs was listener participation in the simulation of whatever glamour attends a Hollywood preview. If there is kinship between the two programs, it rests on their common capitalization of Hollywood glamour. But defendant stops short of executing plaintiff's idea that the public might do more than behold the glamour that spells Hollywood by participating in determining by what and by whom it should be bedazzled.

Spence, J., concurred.

Appellant's petition for a rehearing was denied August 31, 1950. Traynor, J., and Spence, J., voted for a rehearing.